1
2
3
4
5
6

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

7   RAUL BONILLAS, an individual,

8              Plaintiff,

9        vs.

10  UNITED AIR LINES, INC., and DOES 1
    through 10, inclusive,

11

12             Defendants.

Case No:  C 12-6574 SBA

**ORDER GRANTING
DEFENDANT'S MOTION FOIR
SUMMARY JUDGMENT**

Dkt. 54

13       Plaintiff Raul Bonillas ("Bonillas") brings the instant action against his current

14  employer, Defendant United Air Lines, Inc. ("Defendant" or "UAL"), alleging claims for

15  retaliation, and for discrimination on account of his race, national origin and disability,

16  pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with

17  Disabilities Act ("ADA") and the California Fair Employment and Housing Act ("FEHA").

18  These claims arise from UAL's decision not to retain Bonillas in a Supervisor position in

19  2011.  The Court has original jurisdiction over Bonillas' federal Title VII and ADA claims

20  and supplemental jurisdiction over his state law FEHA claims.  28 U.S.C. § 1331, 1332.

21       The parties are presently before the Court on Defendant's Motion for Summary

22  Judgment.  Having read and considered the papers filed in connection with this matter and

23  being fully informed, the Court hereby GRANTS the motion for the reasons set forth

24  below.  The Court, in its discretion, finds this matter suitable for resolution without oral

25  argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).[1]

26

27       [1] Bonillas also filed a Motion for Summary Adjudication of Affirmative Defenses.
    Dkt. 93.  In view of the Court's decision granting UAL's Motion for Summary Judgment,
28  Bonillas' motion is DENIED as moot.

I. **<u>INTRODUCTION</u>**

    A. **FACTUAL SUMMARY**

        **1.    Bonillas' Position, Duties and Job Performance**

On April 29, 1986, Bonillas began working as a Mechanic for UAL.  Thompson Decl. Ex. A ("Bonillas Dep.") 16:17-19, Dkt. 55.  For the next two decades, Bonillas worked in a variety of capacities, including Airline Mechanic, Lead Mechanic, Foreman, and Senior Supervisor.  Bonillas Decl. ¶¶ 4-8, Dkt. 72-1.

On March 3, 2008, Bonillas was promoted to Supervisor–Components Maintenance. Bonillas Dep. 24:16-17.  In that capacity, Bonillas worked in the Components shop (also referred to as "SFOLX") in UAL's maintenance facility at the San Francisco International Airport ("SFO").  The decision to promote Bonillas was made by Kevan Sklanka ("Sklanka"), the Manager of the Components shop, and Bonnie Turner ("Turner"), Managing Director of Components, Overhaul and Repair.  Bonillas Dep. 20:10-17, 24:16-21; Turner Decl. ¶¶ 2-3, Dkt. 62; Thompson Decl. Ex. D (Sklanka Dep.) 11:3-5, 14:14-22; 15:6-16:13, Dkt. 54-1.

As a Supervisor, Bonillas' two primary duties were to manage a crew of mechanics and ensure technical compliance with aircraft component repairs.  Bonillas Dep. 40:1-42:16, 65:14-18, 67:7-68:11 and Ex. 2.  His employee management responsibilities required him to oversee the work of his employees, serve as a leadership role model, prioritize his employees' work assignments, address any type of personnel/human resource issues affecting the workplace, promote effective communication with employees to achieve production objectives, and ensure compliance with applicable safety guidelines. Id.; Sklanka Dep. 19:3-18; Thompson Decl. Ex. B (Wagner Dep.) 20:9-17; Stewart Decl. ¶ 3, Dkt. 60; Telson Decl. ¶ 3, Ex. A, Dkt. 61.  In addition, Bonillas claims that he was

1   required to investigate and handle workplace issues, including complaints of harassment
2   and workplace violence.  Bonillas Decl. ¶¶ 13-14.[2]

3       Sklanka prepared Bonillas' annual performance appraisals for 2008 and 2009.  For
4   the 2008 evaluation, Slanka rated Bonillas' overall performance as a "3" (i.e., average) on a
5   scale of "1" to "5," with "1" being the worst and "5" being the best.  28:15-30:23.  Bonillas
6   scored below average in several areas, including the ability to resolve conflicts involving
7   employees and/or customers, the ability to provide leadership for his staff, an inability to
8   make decisions and to take ownership of those decisions, and to ensure follow-through with
9   respect to his decisions.  Sklanka Dep. 19:19-20:25, 28:5-30:14, 30:9-23, 33:5-34:24;
10  Turner Decl. ¶ 6.  In his 2009 review, Bonillas' overall performance was again rated by
11  Sklanka as a "3" with below average scores in the areas of safety, performance and costs.
12  Sklanka Dep. 103:3-24.

13      In 2010, Bonillas began supervising an employee named Karl Scheele ("Scheele").
14  Id. ¶ 13.  According to Bonillas, beginning in March 2010 and continuing through the
15  following year, he conducted six investigations into complaints made by various UAL
16  employees regarding Scheele's alleged threats and harassment.  Id. ¶¶ 28-33.  Consistent
17  with his job duties, Bonillas involved other UAL departments, including Labor Relations,
18  Human Resources and Corporate Security.  Id. ¶ 14.  In particular, Bonillas worked with
19  Ahnvy Ly ("Ly"), then an HR Senior Staffing Representative—Labor Relations, regarding
20  the complaints made against Scheele.  Ly Decl. ¶ 5, Dkt. 59.  Ly and HR determined that
21  the complaints raised only workplace issues, as opposed to complaints of discrimination or
22  unlawful harassment, which were appropriately addressed at the department level.  Id.

23      In November 2010, Kenneth Holder ("Holder") became the Manager—Components
24  at SFOLX, and replaced Sklanka as Bonillas' supervisor.  Holder Decl. ¶ 1, Dkt. 58;

25  _____
26      [2] According to UAL, complaints of harassment, unlawful discrimination and
    retaliation could be made by any employee to his or her supervisor or other management
27  personnel, who, in turn, were to report such complaints to Human Resources ("HR") or
    Labor Relations.  Ly Decl. ¶ 4.  If the complaint was determined to be a workplace issue,
28  the matter would be referred to the complaining employee's department for investigation
    and handling.  Id.

Bonillas Decl. ¶ 15; Bonillas Dep. 27:15-21, 33:12-34:19; Thompson Decl. Ex. C (Holder Dep.) 16:15-17.  Like Sklanka, Holder found that Bonillas exhibited difficulties in the areas of conflict and personnel issues, decision-making, and candor.  Holder Decl. ¶ 2.  Given the amount of time that Bonillas had been a Supervisor, Holder opined that Bonillas should have been able to develop and demonstrate the necessary leadership, communication, and management skills for his position.  Id.

Holder's negative impressions of Bonillas were corroborated during the annual performance evaluation process during which six Supervisors managed by Holder, including Bonillas, were reviewed for the 2010 calendar year.  Holder Decl. ¶ 4; Fulton Decl. ¶ 3, Dkt. 57.  The evaluation process began with a "calibration" session attended by Holder, other managers in Turner's organization, and representatives from HR.  Holder Dep. 49:8-51:9, 54:14-16; Fulton Decl. ¶ 3; Webb Decl. ¶¶ 3, 4, Dkt. 63; Turner Decl. ¶ 5; Holder Decl. ¶ 4.[3]  During the session, the group consensus was that Bonillas was the weakest Supervisor in the group, particularly with regard to his leadership and management skills, and that he should be given an overall rating of Underperforms.  Holder Dep. 51:6-52:25; Turner Decl. ¶ 6; Holder Decl. ¶ 4.[4]

Following the calibration session and after conferring with Sklanka, Holder prepared 2010 performance evaluations for all of the Supervisors in his department based on the findings from the session.  Holder Decl. ¶ 5.  Holder assigned Bonillas an overall rating of Underperforms based on deficiencies in his leadership and management skills.  Id.[5] Bonillas disagreed with the Underperforms rating and appealed the performance evaluation to Holder's new supervisor, Managing Director Shannon Wagner ("Wagner").  Bonillas

---

[3] The managers at the calibration session were Bill Fulton, Tom Cornacchini, Tim Minihan.  Holder Decl. ¶ 4.  Managing Director Bonnie Turner also was present.  Id.

[4] Beginning in 2010, the annual performance review 1-5 rating system was replaced with a three-tier ranking of Underperforms, Successful, and Exceptional.  Turner Decl. ¶ 4.

[5] By way of comparison, the other Hispanic Supervisor evaluated by Holder (identified as "Employee 13") received an "Exceptional" performance rating—the highest score given to any of the Supervisors that Holder evaluated.  Id. ¶ 8.

Dep. 183:11-15; Wagner Dep. 23:17-24:5. Wagner met separately with Bonillas to discuss his concerns, and with Holder to have him explain his reasoning behind Bonillas' performance review. Bonillas Dep. 183:16-24; Wagner Dep. 25:15-27:9, 28:13-25, 30:5-12; Holder Dep. 137:2-18. Wagner ultimately denied Bonillas' appeal, but offered to help Bonillas improve his skills and made himself available to Bonillas for that purpose. Bonillas Dep. 177:2-6, 178:7-20, 179:6-9; Wagner Dep. 29:6-11, 30:13-19, 30:23-31:10, 31:20-33:11, 38:8-40:6, Ex. 3.

Subsequent to his review, Bonillas continued to have difficulty managing personnel. His performance issues eventually culminated in a meeting in May 2011 (arranged by Wagner) attended by Bonillas, Scheele, Holder, and several Union representatives. Wagner Dep. 51:14-53:11, 57:3-6, 59:19-23; Bonillas Dep. 158:21-25; Holder Dep. 130:9-22, 131:6-22. Scheele had sent Wagner a lengthy email complaining that Bonillas was "out to get him" and cited a number of specific examples to support his claim. Wagner Dep. 48:11-19, 50:13-18, 51:14-53:11. Bonillas was told that the purpose of the meeting was to discuss issues Scheele had with him, and to determine how they could work together more productively. Bonillas Dep. 160:15-22, 161:5-15; Wagner Dep. 53:12-55:7, Ex. 6; Ly Decl. ¶ 10. Holder defended Bonillas during the meeting by stating that he did not feel that Bonillas was "out to get" Scheele. Bonillas Dep. 254:2-7; Wagner Dep. 61:2-6; Holder Dep. 133:6-14, 134:22-135:22. In the end, Scheele and Bonillas both agreed they would try to work with one another in the future. Bonillas Dep. 169:25-170:9.

Holder was subsequently replaced by Sinasi Stewart ("Stewart"), Senior Manager— Components Base Maintenance, who then managed six Supervisors, including Bonillas. Stewart Decl. ¶ 1.[6] Bill Fulton, another Senior Manager—Components Base Maintenance at SFOLX, managed eight other supervisors. Id. ¶ 3; Fulton Decl. ¶ 1. Soon after Stewart began supervising Bonillas, he observed many of the same performance weaknesses. Stewart believed that Bonillas had communication issues, both with his peers during

---

[6] Holder lost his position at the SFOLX maintenance facility as part of the TAS process and now works for United at Dulles Airport in Virginia. Holder Decl. ¶¶ 1, 9.

turnover in between shifts, and seemed to have difficulty managing the personalities of the Mechanics he supervised.   Stewart Decl. ¶ 5.

### 2.        Bonillas Loses His Supervisor Position

Meanwhile, during the midst of the above-described events, UAL, the entity which originally hired Bonillas, merged with Continental Airlines in October 2010.  Dome Decl. ¶ 2, Dkt. 56.  Following the merger, UAL notified its workforce that a reduction in force ("RIF") was likely, in order to eliminate redundancy in the two company's workforces.  Id. ¶ 3.  The RIF was not company-wide, and some departments merely underwent restructuring that resulted in changes to existing positions, sometimes including modifications to both the scope and substance of job responsibilities. Dome Decl. ¶ 3; Tetrev Decl. Ex. A, Dkt. 64.  To that end, UAL employed a Talent and Selection ("TAS") Process in making its retention decisions.  Dome Decl. ¶¶ 3-4.  All managers, supervisors, and administrative employees at the newly-merged company, including Bonillas, went through the TAS process.  Id. ¶ 4.

The SFOLX Component shop went through the TAS process in the summer of 2011. Stewart Decl. ¶ 6; Fulton Decl. ¶ 4.  As a result, Bonillas, along with all other Supervisors in both Stewart's and Fulton's organizations, had to reapply for their positions.  Bonillas Dep. 189:13-190:18.  Bonillas was initially screened out of the application process by a neutral corporate recruiter because of his Underperforms rating.  Fulton Decl. ¶ 5. Nonetheless, Fulton, with the agreement of Stewart, decided that Bonillas should be afforded the opportunity to interview for the Supervisor opening since he was the incumbent in that position.  Id. ¶ 6; Stewart Decl. ¶ 8.

Stewart and Fulton interviewed twenty-four candidates, including Bonillas, and ranked each of them in order of preference for hiring.  Telson Decl. ¶ 8, Ex. D; Stewart Decl. ¶ 4, Ex. F; Fulton Decl. ¶¶ 11, Ex. C.  Bonillas performed poorly during the interview, scoring the lowest possible score ("1" out of "5") on every question but one (where he scored a "2"), and was ranked 22nd out of the 24 candidates who were interviewed.  Stewart Decl. ¶¶ 12, 14, Exs. D-F; Fulton Decl. ¶¶ 9-11, Exs. B, C; Telson

Decl. ¶ 8, Ex. D.  Fulton and Stewart decided Bonillas would not be offered the position.
Stewart Decl. ¶ 15; Fulton Decl. ¶ 12.  Their decision not to hire Bonillas was approved by
Wagner, the Managing Director.  Wagner Dep. 106:16-107:9, 108:11-110:12, 111:13-17.
Of the sixteen individuals hired for Supervisor positions, eight were minorities, including
two Hispanics.  Stewart Decl. ¶ 17; Fulton Decl. ¶ 14; Telson Decl. ¶¶ 10, 11, Ex. F.  None
of those individuals had been rated as Underperforms in their performance evaluations.
Fulton Decl. ¶ 14.

After being informed that he had not been selected for one of the Supervisor
positions, Bonillas exercised his seniority rights and returned to a Mechanic position,
effective October 1, 2011, with no break in pay.  Bonillas Dep. 197:4-10, 197:19-22, 279:1-
9, 322:12-323:6; Stewart Decl. ¶ 18.  He currently remains employed by United as a
Powerplant Technician.  Bonillas Dep. 16:17-22, 19:2-5.

### B.   PROCEDURAL HISTORY

On December 31, 2012, Bonillas filed a Complaint against UAL in this Court
alleging seven claims for relief:  (1) race discrimination under Title VII; (2) race
discrimination under FEHA; (3) national origin discrimination under Title VII; (4)
disability discrimination under the Americans with Disabilities Act ("ADA"); (5) disability
discrimination under FEHA; (6) retaliation under Title VII; and (7) retaliation under FEHA.
UAL now moves for summary judgment as to all claims alleged in the pleadings.  The
motion is fully briefed and is ripe for adjudication.[7]

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that a party may move for summary
judgment on some or all of the claims or defenses presented in an action.  Fed. R. Civ. P.
56(a)(1).  "The court shall grant summary judgment if the movant shows that there is no

---

[7] UAL requests that the Court disregard the final two pages Bonillas' 27-page
opposition on the ground that it exceeds the applicable 25-page limit, and the supporting
declarations, which were filed late.  See Civ. L.R. 7-2(a)-(b).  While UAL's requests are
facially reasonable, there is no indication that UAL was prejudiced in the preparation and
filing of its reply papers.  Therefore, the Court exercises its discretion to consider the brief
in its entirety and the untimely filed declaration.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id.; see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party has the burden of establishing the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in the record").  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting in part Scott v. Harris, 550 U.S. 372, 380 (2007)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 248.  A factual dispute is genuine if it "properly can be resolved in favor of either party."  Id. at 250. Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).  Only admissible evidence may be considered in ruling on a motion for summary judgment.  Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

## III.   DISCUSSION

### A.   RACE AND NATIONAL ORIGIN DISCRIMINATION

Title VII provides that employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).[8]  "A plaintiff

---

[8]  A FEHA is analyzed in the same manner as a Title VII claim.  See Brooks v. City of San Mateo, 229 F.3d 917, 923 (9th Cir. 2000).

alleging disparate treatment under Title VII must first establish a prima facie case of discrimination by offering evidence that "give[s] rise to an inference of unlawful discrimination." EEOC v. Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Ultimately, the plaintiff must show that his race or national origin was the "motivating factor" for the challenged employment practice. 42 U.S.C. § 2000e-2(m); Staub v. Proctor Hosp., -- U.S. --, 131 S.Ct. 1186, 1191 (2011).

"A plaintiff may establish a prima facie case either by meeting the four-part test laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), or by providing direct evidence suggesting that the employment decision was based on an impermissible criterion[.]" Boeing Co., 577 F.3d at 1049 (citation omitted). "'Direct evidence is evidence, which if believed, proves the fact of [discriminatory animus] without inference or presumption.'" Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998). Direct evidence is usually composed of "clearly sexist, racist, or similarly discriminatory statements or actions by the employer." Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094-95 (9th Cir. 2005); e.g., Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1150 (9th Cir. 1997) (referring to a Mexican-American employee as a "dumb Mexican" was direct evidence of race discrimination). "Because direct evidence is so probative, the plaintiff need offer very little direct evidence to raise a genuine issue of material fact." Coghlan, 413 F.3d at 1095 (internal quotation marks omitted).

Under the McDonnell Douglas test for circumstantial evidence, a plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly-situated individuals outside the protected class were treated more favorably. Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1105 (9th Cir. 2008) (citing McDonnell Douglas Corp., 411 U.S. at 802). "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.

1   1994).  "When the evidence on which a plaintiff relies is circumstantial, 'that evidence

2   must be specific and substantial to defeat the employer's motion for summary judgment.'"

3   Anthoine v. N. Cent. Cntys. Consortium, 605 F.3d 740, 753 (2010) (quoting Boeing Co.,

4   577 F.3d at 1049).

5        If the plaintiff establishes a prima facie case of discrimination, the burden "shifts to

6   the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly

7   discriminatory conduct."  Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 640 (9th Cir.

8   2003).  Finally, if the employer articulates a legitimate reason for its action, "the employee

9   must then prove that the reason advanced by the employer constitutes a pretext for unlawful

10  discrimination."  Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1207 (9th Cir. 2008).

11                **1.**     **Prima Facie Case**

12       In the instant case, Plaintiff relies on circumstantial evidence to establish a prima

13  facie case of race (Hispanic) and national origin (Mexican-American) discrimination under

14  McDonnell Douglas.  Opp'n at 20.  UAL does not dispute that Bonillas can show

15  membership in a protected class and that the suffered an adverse employment action.  UAL

16  contends, however, that Bonillas was not qualified for the Supervisor position and no

17  similarly-situated individuals outside his protected class were treated more favorably.  The

18  Court discusses each contention, in turn.

19               *a)*     *Qualified for the Position*

20       The Supervisor position includes responsibility for ensuring technical compliance

21  with aircraft component repair and managing a team of unionized mechanics who work on

22  aircraft components.  Bonillas Dep. 40:1-42:16, 65:14-18, 67:7-68:11 and Ex. 2.  UAL

23  contends that, while Bonillas was technically proficient, he ineffectively performed the

24  employee management aspects of the position.  In particular, UAL points to evidence that

25  Bonillas' supervisors found him to be a poor manager, decision-maker and leader, as

26  evidenced by the overall rating of Underperforms.  Holder Dep. 51:6-52:25; Turner Decl.

27  ¶ 6.

28

Bonillas acknowledges that he received poor performance evaluations, but asserts that Holder and Wagner (to whom Holder reported) gave him "inconsistent" feedback. Opp'n at 20.  First, Bonillas points out that in his 2010 performance evaluation, Holder rated him as Successful in all of the Individual Goals categories.  Id. (citing Holder Dep. 61:21-62:9, 63:3-4).  Though not entirely clear, Bonillas appears to claim that an overall Underperforms rating cannot be reconciled with a Successful rating in certain areas of his performance.  However, Bonillas fails to present any admissible evidence to support his argument.  The supporting excerpts from Holder's deposition, which are attached to the declaration of Bonillas' counsel Dow Patten, lack the requisite reporter's certification.  See Orr, 285 F.3d at 774 ("a deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification.").  Because the excerpts are not properly authenticated, they cannot be considered in connection with the instant summary judgment.  Id.  In addition, some of the cited pages from Holder's deposition are missing from the record submitted by Bonillas.  See Patten Decl. Ex. C (excerpts from Holder deposition), Dkt. 74-1.

Even if the evidence proffered by Bonillas were admissible, it does not support his assertion that Holder's feedback was cannot be reconciled with his performance reviews. In explaining his overall rating of Underperforms, Holder stated that Bonillas had engaged in poor decision-making and behavior thereby placing himself in "compromising and embarrassing situations" in a manner "unbecoming of a supervisor."  Holder Dep. Ex. 3. He also indicated that Bonillas had received counseling sessions for his job performance issues, which included "forgetfulness, disrespecting other supervisors, transparency and honesty to [his] manager and other employees."  Id.  Holder also rated Bonillas as Underperforms in Leadership Success Factors and Customer Service, noting that he was dishonest with others, failed to follow through on commitments, and failed to hold employees accountable for their actions.  In view of the highly critical remarks regarding Bonillas' overall performance, the mere fact that he scored well in Individual Goals does not amount to "inconsistent feedback."  See Opp'n at 20.

Second, Bonillas also attempts to make much of emails he received from Wagner, Holder's manager, congratulating him on a "job well done."  Opp'n at 20 (citing Wagner Dep. 149:1-13).  Again, the cited deposition transcript excerpts are not properly authenticated and cannot be considered.  See Orr, 285 F.3d at 774.  That aside, the emails are inapposite.  Wagner testified in his deposition that he "regularly" sent congratulatory emails to the supervisor in charge anytime there was an "accomplishment in the shop."  Wagner Dep. 149:6-10.  There is no evidence regarding the particular reasons Wagner sent the emails or that they were in any way connected to Bonillas' overall performance of his Supervisor responsibilities.  Wagner's emails to Bonillas thus do not demonstrate that he was given inconsistent feedback regarding his performance nor does it raise a genuine issue of material fact as to whether he was qualified for the Supervisor position.

### b)      *Similarly-Situated*

Another essential component of a prima facie case of unlawful discrimination requires the plaintiff to show that similarly-situated individuals outside of the plaintiff's protected class were treated more favorably.  To satisfy this requirement, the plaintiff must show that the persons whom he claims were treated more favorably were "similarly situated in all material respects."  Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006); accord Earl v. Nielsen Media Research, 658 F.3d 1108, 1114 (9th Cir. 2011) (noting that "individuals 'are similarly situated when they have similar jobs and display similar conduct'").  The failure make such a showing warrants summary judgment.  Leong v. Potter, 347 F.3d 1117, 1124 (9th Cir. 2004) (upholding grant of summary judgment where employee failed to show that

similarly-situated employees were treated more favorably) (quoting in part <u>Vasquez</u>, 349 F.3d at 641.[9]

"A plaintiff may raise a triable issue of pretext through comparative evidence that the employer treated [individuals outside of the protected class] but otherwise similarly situated employees more favorably than the plaintiff." <u>Earl v. Nielsen Media Research, Inc.</u>, 658 F.3d 1108, 1113 (9th Cir. 2011).   In the instant case, Bonillas asserts that two non-Hispanic employees, James Varghese ("Varghese") and Yvonne Pierce ("Pierce"), received preferential treatment.  Opp'n at 21.[10]  In particular, he claims that both individuals had "documented performance issues," but were placed on performance improvement plan ("PIPs") and were maintained in their Supervisor positions.  <u>Id.</u> at 21, 24.  In contrast, Bonillas asserts that Wagner "was going to have Stewart place [him] on a PIP and allow him to stay in his position"—which apparently did not transpire.  <u>Id.</u> at 24.

No admissible evidence is presented to support Bonillas' contention that non-Hispanics were treated more favorably.  Bonillas cites various pages from the deposition of HR manager Ly, <u>see</u> Opp'n at 21, 24, but failed to provide the requisite reporter's certification to properly authenticate the transcript.  <u>See</u> <u>Orr</u>, 285 F.3d at 774.  In addition, only some of the cited pages was provided to the Court.  <u>See</u> Patten Decl. Ex. A.  On the

---

[9] Bonillas contends that the Court cannot reach the issue of whether similarly-situated employees outside his protected class were treated more favorably at the prima facie stage.  Opp'n at 21.  This contention lacks merit.  "The concept of 'similarly situated' employees may be relevant to both the first and third steps of the <u>McDonnell Douglas</u> framework."  <u>Hawn v. Exec. Jet Mgmt., Inc.</u>, 615 F.3d 1151, 1158 (9th Cir. 2010).  However, "these inquiries constitute distinct stages of the <u>McDonnell Douglas</u> burden-shifting analysis."  <u>Id.</u>  Among other things, "a plaintiff's burden is much less at the prima facie stage than at the pretext stage."  <u>Id.</u>  While <u>Hawn</u> observed that the issue of whether employees are similarly-situated is more commonly resolved at the more rigorous pretext stage, a court may properly analyze the issue at both the prima facie and pretext stages.  615 F.3d at 1159.  As will be discussed, under either standard, Bonillas has failed to raise a genuine issue of material fact regarding whether similarly-situated individuals outside the protected class were treated more favorably.

[10] Later in his opposition, Bonillas makes an inconsistent argument that Varghese and Pierce complained to Ly that their PIPs were unfair, and that "[t]his evidence of hostility towards minorities is further evidence of pretext."  Opp'n at 24.  There is no evidence that either employee is a minority or that they were treated unfairly on account of their race.

particular page that was provided, Ly stated only that Varghese and Pierce had "mentioned" being placed on PIPs.  Patten Decl. Ex. A (Ly Dep.) 29:18-22.  Ly's statements regarding what others may have told her lacks foundation and constitutes inadmissible hearsay. Jacobsen v. Filler, 790 F.2d 1362, 1367 (9th Cir. 1986) (deposition testimony about what others told the deponent is not based on personal knowledge and is inadmissible hearsay). In any event, the mere possibility that Varghese and Pierce were placed on PIPs and retained in their unspecified positions, without more, does not show or suggest that they were similarly-situated and treated more favorably.  See Vasquez, 349 F.3d at 641 (holding that employee who "did not engage in problematic conduct of comparable seriousness to that of [plaintiff]" was not similarly situated).

Equally unavailing is Bonillas' contention that three non-Hispanic employees, i.e., Anthony Shevchenko ("Shevchenko"), Ian Paul Chin and Tyles Hammond, each were offered Supervisor positions, whereas he was not.  Opp'n at 21.  Again, Bonillas fails to offer any admissible evidence that these individuals were similarly-situated to him in all material respects in terms of qualifying for the Supervisor position.  See Vasquez, 349 F.3d at 641.  Merely asserting that these individuals are similarly-situated does not make them so.  See Forsberg v. Pac. Nw. Bell Tel. Co., 840 F.2d 1409, 1419 (9th Cir. 1988) ("[P]urely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment.").  In sum, the Court finds that Bonillas has failed to raise a genuine issue of fact regarding whether similarly-situated individuals were treated more favorably.

### 2.    Legitimate Reason

Even if Bonillas had established a prima facie case of discrimination, which he has not, UAL has articulated a legitimate, non-discriminatory reason for its actions.  See Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (Once a prima facie case has been shown, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.").  UAL presents admissible evidence that Bonillas has had documented problems

in the areas of leadership, conflict management, and decision-making ability.  Sklanka Dep. 30:5-23, 33:5-34:24, 36:4-12, 38:4-22, Exs. 1, 2.  Bonillas' deficient performance as a Supervisor was confirmed in his 2010 performance evaluation wherein he received an overall rating of Underperforms.   Notably, that evaluation cited the same type of concerns mentioned in his earlier reviews.  Holder Decl. ¶¶ 4, 5, Ex. A; Holder Dep. 49:8-51:9; Turner Decl. ¶¶ 5, 6; Fulton Decl. ¶ 3; Webb Decl. ¶¶ 3-5.  During his job interview, Bonillas performed poorly and was the only candidate interviewed for a Supervisor position who had an Underperforms rating on his most recent performance evaluation.  Fulton Decl. ¶ 12; Stewart Decl. ¶ 15; Telson Decl. ¶¶ 5, 6, Exs. B, D; Fulton Decl. ¶ 11, Ex. C; Stewart Decl. ¶14, Ex. F; Telson Decl. ¶ 8, Ex. D.  Also, he ranked almost at the bottom of the pool of twenty-four candidates interviewed.  Stewart Decl. ¶¶ 12, 14, Exs. D-F; Fulton Decl. ¶¶ 9-11, Exs. B, C; Telson Decl., ¶ 8, Ex. D.  Based on the record presented, the Court finds the UAL has proffered a legitimate, non-discriminatory reason for its decision not to offer Bonillas the Supervisor position.

### 3.    Pretext

Where, as here, the employer presents legitimate reasons for the challenged action, "the burden shifts back to the employee to demonstrate a triable issue of fact as to whether such reasons are pretextual."  Pardi v. Kaiser Found. Hosps., 389 F.3d 840, 849 (9th Cir. 2004).  "To establish that a defendant's nondiscriminatory explanation is a pretext for discrimination, plaintiffs may rely on circumstantial evidence, which [the Ninth Circuit] previously said must be 'specific' and 'substantial' to create a genuine issue of material fact."  Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1029 (9th Cir. 2006).

### a)    *Reduction in Force (RIF)*

Bonillas first contends that UAL relied on the RIF as its legitimate business reason for not retaining him as a Supervisor, but that no RIF actually occurred.  Opp'n at 17, 23.  However, UAL has not cited the RIF as its legitimate, non-discriminatory reason for not retaining Bonillas in his Supervisor position.  Rather, UAL's position is that Bonillas was not selected due to his subpar performance as a Supervisor (as reflected in his performance

1  review), and his poor showing during the Supervisor interview process.  Mot. at 7-9.  Thus,

2  whether or not UAL eliminated or added Supervisors at SFOLX is of little moment.

3                        ***b)***      ***TAS Procedures***

4          Next, Bonillas contends that UAL did not follow TAS rules in considering

5  candidates for the Supervisor positions.  Opp'n at 18, 23.  According to Bonillas, TAS rules

6  provide that only incumbents could apply for the Supervisor positions, but that UAL

7  allowed Shevchenko, "a non-incumbent and unqualified person," to be considered.  Id. at

8  18.  Deviations from protocol and procedural irregularities may give rise to an inference of

9  pretext.  Porter v. Cal. Dep't of Corr., 419 F.3d 885, 896 (9th Cir. 2005).  However, none of

10  the exhibits cited by Plaintiff (which appear to be various emails exchanged by Wagner,

11  HR and other individuals), see Patten Decl. Ex. D (Bates No. 4001, 4029-30, 4036-38,

12  4040), is admissible, as they lack foundation and are inadmissible hearsay.  See Fed. R.

13  Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to

14  support a finding that the witness has personal knowledge of the matter."); id. 901(a) ("To

15  satisfy the requirement of authenticating or identifying an item of evidence, the proponent

16  must produce evidence sufficient to support a finding that the item is what the proponent

17  claims it is.");  Id. 802 (precluding admission of hearsay).

18          Even if admissible, the contents of the cited documents do not support Bonillas'

19  assertions of pretext.  There is no evidence that allowing Shevchenko to interview for an

20  open Supervisor position was motivated by racial animus against Hispanics or persons of

21  Mexican-American descent, a preference for non-minority applicants, or demonstrate that

22  he was otherwise unqualified for the position.  See Salter v. United States Dep't of

23  Veterans Affairs,  252 Fed.Appx. 804, 805, 2007 WL 3226037, *1 (9th Cir. Oct. 29, 2007)

24  (finding that the employer's failure to follow its internal hiring procedures was not

25  probative because the plaintiff had failed to explain how such conduct was racially-

26  motivated).[11]  Moreover, allowing Shevchenko to interview affected all incumbent

27  _____

28      [11] To the contrary, Wagner commented that he felt an exception should be made
because Shevchenko was one if UAL's "top supervisors in SFOLX."  Id. (Bates No. 4040).

applicants, not solely Bonillas.  "[W]here 'the alleged procedural irregularity disadvantaged all potential applicants' for a promotion, rather than just members of a protected class, the fact that a company failed to follow its own procedures 'does not suggest either that the defendant's proffered reasons for its employment decisions were pretextual or that the defendant was motivated by illegal discrimination.'"  <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 n.9 (10th Cir. 2000) (citation omitted).   That UAL may have made an exception for Shevchenko, without more, is unavailing for purposes of showing pretext.

As an ancillary matter, Bonillas posits that "the decision-makers already had a candidate in mind when they interviewed [him] and ranked him low in order to give the position to a non-incumbent."  Opp'n at 19.  Even if there were admissible evidence to support this statement, which there is not, it would prove nothing.  To survive summary judgment, Bonillas must present evidence directly or inferentially showing that UAL ranked him "low" in the interview process because of his membership in a protected class or in retaliation for engaging in protected activity.  Since Bonillas has made no such showing, whether or not UAL ranked him low in order to favor Shevchenko is inapposite for purposes of showing a genuine issue of fact as to pretext.

### c)      *Other Minorities*

Equally unavailing is Plaintiff's claim that other "minorities" were treated "negatively."  Opp'n at 23-24.  Specifically, he alleges that: (1) "Wagner did not like [him]" or three other "employees of color"; (2) two minorities were "treated negatively" by having been placed on PIPs; and (3) "[o]nly two Supervisors in the whole division lost their job and they were both Hispanic."  <u>Id.</u>  These arguments are unsupported by any admissible evidence.

With regard to the first point, Bonillas cites a document identified only as Exhibit D (Bates No. 00251) to the declaration of Dow Patten.  Opp'n at 23.  Exhibit D is a one inch thick, undifferentiated amalgam of disparate documents produced by UAL and presented in seemingly random order.  Patten Decl. ¶ 5.  The district court is not obligated "to scour the

record in search of a genuine issue of triable fact," as it is the nonmoving party's burden "to identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted).  Even so, after reviewing the myriad documents comprising Exhibit D, the Court is unable to locate the document referred to by Bonillas.[12]

Bonillas' contention regarding two other minority candidates, i.e., Varghese and Pierce, having been placed on PIPs, is entirely unsupported for the reasons discussed in the prior subsection.[13]  In addition, Bonillas' claim that these two candidates were "treated negatively" because of their minority status is at odds with his earlier assertion that Varghese and Pierce received better treatment than him.  Compare Opp'n at 21 with id. at 23.

Finally, the only evidence offered in support of Bonillas' claim that only two Supervisors who were purportedly not hired were Hispanic consists of Bonillas' inadmissible deposition testimony.  As to Jaime Barcenas ("Barcenas"), who worked in another department, Bonillas testified that he did not know the reasons that he was not selected or who made the selection decision.  Bonillas Dep. 204:2-207:16.  In addition, Bonillas indicated that his belief was based on what Barcenas had told him.  Id. 207:5-7.  The other employee, Jay Torres ("Torres") was an operations manager who did not work at SFOLX.  Id. 201:8-22.  Torres was allowed to maintain his position, but was moved to graveyard, "the least desirable shift."  Id. 202:6-12.  As with Barcenas, Bonillas admitted that he had no personal knowledge of the reasons for the shift change.  Id. 203:204:2.  The

---

[12] There is, however, a document marked Bates No. 002051, which appears to be handwritten notes apparently purporting to summarize a statement possibly made by Bonillas.  Patten Decl. Ex. D.  This document is not admissible evidence.  Nowhere in the Patten declaration (to which the document is attached) is there any indication as to what the document is, who authored it, or the circumstances surrounding its creation.  Fed. R. Evid. 602, 901(a).  In addition, the notes are hearsay and contain double hearsay.  Id. 802.  In any event, there is no mention in the document about Wagner disliking employees of color.

[13] Bonillas asserts that Varghese and Pierce are "both non-Hispanics" but are "minorities."  Opp'n at 21.  The race or national original of either individual is not disclosed.

record thus demonstrates that Bonillas claim that Hispanic employees were treated less favorably lacks foundation and constitutes inadmissible hearsay.   See McClain v. Cnty. of Clark, No. 2:10-cv-02117-LDG-LRL, 2012 WL 3317273, *7 (D. Nev. Aug. 13, 2012) (plaintiff's unsupported speculation that defendant was systematically removing older, more experienced Caucasians and replacing them with younger, Filipino workers insufficient to establish pretext); Horn v. Cushman & Wakefield W., Inc., 72 Cal. App. 4th 798, 807 (1999) (issues of fact cannot be "created by speculation or conjecture").   As such, all of his "evidence" must be disregarded.   The Court therefore finds that Bonillas has failed to raise a genuine issue of fact regarding whether UAL's reasons for not retaining him in the Supervisor position are pretextual.

## B.   DISABILITY DISCRIMINATION UNDER THE ADA

Title I of the ADA prohibits employment discrimination "against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a); Lopez v. Pac. Mar. Ass'n, 657 F.3d 762, 764 (9th Cir. 2011).  To state a prima facie claim under the ADA, a plaintiff must demonstrate: (1) that he is a "qualified individual" within the meaning of the ADA; (2) that he can perform the essential functions of his job; and, (3) that he suffered an adverse employment action because of the disability.  Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996).  FEHA provides protections analogous to the ADA, see Cal. Gov. Code § 12940(a), and, as such, FEHA disability discrimination claims are analyzed similarly, see Deschene v. Pinole Point Steel Co., 76 Cal. App. 4th 33, 44 (1999).

Bonillas alleges that UAL discriminated against him on account of his Post Traumatic Stress Disorder ("PTSD").  Compl. ¶ 73.[14]  To prove a disability discrimination claim, "a plaintiff must prove the employer had knowledge of the employee's disability when the adverse employment decision was made."  Brundage v. Hahn, 57 Cal. App. 4th

---

[14] During his deposition, Bonillas mentioned a second "disability" in the form of a back injury he suffered in 1992. Bonillas Dep. 122:5-8. Since this particular disability is not alleged in the pleadings, it not properly before the Court.  See Pickern v. Pier 1 Imps. (U.S.), Inc., 457 F.3d 963, 968-69 (9th Cir. 2006). There also is no evidence connecting the 1992 back injury to UAL's decision not to retain Bonillas as a Supervisor.

228, 236-37 (1997).  "An adverse employment decision cannot be made because of a

disability when the disability is not known to the employer."  Id. at 236.  Here, the only

person at UAL who was aware of Bonillas' condition was Holder, who was not involved in

the Supervisor selection process.  Bonillas Dep. 129:16-133:23.  Bonillas has likewise

failed to present any evidence that the persons involved in his hiring decision were aware

that he had PTSD.  Opp'n at 26.  To the contrary, the record shows that they were not.

Stewart Decl. ¶ 19; Fulton Decl. ¶ 15; Wagner Dep. 77:-78:3.  Accordingly, UAL is

entitled to summary judgment on Bonillas' disability discrimination claims.

### C.   RETALIATION UNDER TITLE VII

Title VII prohibits retaliation against a person who has exercised his rights under the

Act by claiming discrimination or seeking to enforce the Act's provisions.  42 U.S.C.

§ 2000e-3(a).  Retaliation may be shown by direct or circumstantial evidence.  Stegall v.

Citadel Broad., 350 F.3d 1061, 1066 (9th Cir. 2003).  When relying on circumstantial

evidence to establish a prima facie case of retaliation, the plaintiff must establish that:  "(1)

he engaged in a protected activity; (2) his employer subjected him to an adverse

employment action; and (3) a causal link exists between the protected activity and the

adverse action."  Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000).  "Once [a prima

facie case is] established, the burden shifts to the defendant to set forth a legitimate, non-

retaliatory reason for its actions; at that point, the plaintiff must produce evidence to show

that the stated reasons were a pretext for retaliation."  Surrell v. Cal. Water Serv. Co., 518

F.3d 1097, 1108 (9th Cir. 2008).  Ultimately, "a plaintiff making a retaliation claim under

[Title VII] must establish that his or her protected activity was a but-for cause of the alleged

adverse action by the employer."  Univ. of Tex. S.W. Med. Ctr. v. Nassar, – U.S. —, —,

133 S. Ct. 2517, 2534 (2013).

### 1.   Direct Evidence

Bonillas claims that he has direct evidence of retaliation based on an alleged

statement by Wagner, "that if [he] did not stop reporting Scheele's harassing and

discriminatory conduct to Labor Relations and Human Resources, [he] would be

1   terminated."  Opp'n at 9 (citing Bonillas Dep. 155:16-156:4, 158:16-20).  The cited

2   excerpts from Bonillas' deposition transcript do not support that claim.  Bonillas merely

3   stated that Wagner told him that he needed to stop the employee complaints against

4   Scheele, and that if he failed to do so, he would be fired.  Bonillas Dep. 158:2-20.  In other

5   words, Bonillas was instructed to address the underlying issues involving Scheele in order

6   to eliminate further employee complaints.  Notably, Bonillas did not testify that he was

7   threatened with termination if he reported Scheele's conduct to Labor Relations or HR—

8   and, in fact, later admitted in his deposition that Wagner never made such a statement.  Id.

9   250:21-251:1, 252:16-25, 253:19-254:1.  Although the quantum of direct evidence is "not

10  substantial," Stegall, 350 F.3d at 1066, the direct evidence cited by Bonillas is unavailing.

11  The Court therefore addresses whether Bonillas has sufficient circumstantial evidence of

12  retaliation to survive summary judgment.

13              **2.      Circumstantial Evidence**

14                   *a)      Prima Facie Case*

15          As noted, a prima facie case of retaliation requires the plaintiff to first establish that

16  he was engaged in protected activity.  Title VII's anti-retaliation provision defines

17  protected activity as either (1) opposing any practice made an unlawful employment

18  practice by Title VII or (2) making a charge, testifying, assisting, or participating in any

19  manner in an investigation, proceeding, or hearing under Title VII.  42 U.S.C. § 2000e-3(a).

20  The first clause is known as the "opposition clause," while the second is known as the

21  "participation clause."  Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,

22  555 U.S. 271, 274 (2009).

23          Bonillas contends that he "engaged in protected activity by investigating harassment

24  and retaliation on several occasions."  Opp'n at 10.  That is not protected activity.  By his

25  own admission, such actions were undertaken by Bonillas in the normal course of his job

26  duties as a Supervisor.  Bonillas states that from March 2010 to March 2011, he

27  investigated various employee complaints regarding the conduct of Scheele.  Bonillas Decl.

28  ¶¶ 27-33; Bonillas Dep. 59:10-60:6.  There is no evidence that, in the course of his

investigations, he opposed or protested any practices or actions by UAL relating to those complaints.  At most, Bonillas was engaging in actions that he considered part of his job responsibilities.  Without more, Bonillas cannot show that he engaged in protected activity within the meaning of the opposition clause.  See Learned v. City of Bellvue, 860 F.2d 928, 932 (9th Cir. 1988) ("[T]he opposition clause, by its terms, protects only those employees who *oppose* what they reasonably perceive as discrimination under the Act.") (emphasis added); e.g. Valero v. San Francisco State Univ., No. C 12-4744 TEH, 2014 WL 1339618, *5  (N.D. Cal. Apr. 2, 2014) (granting summary judgment on plaintiff's retaliation claim, finding that "[she] cannot claim that merely doing the job she was hired to do constituted protected activity.") (Henderson, J.); Motoyama v. Haw., Dept. of Transp., 864 F. Supp. 2d 965, 978 (D. Haw. 2012) ("Plaintiff's mere participation in and investigation of employee complaints, as part of her job, is not a protected activity."); see also McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486 (10th Cir. 1996) (holding that plaintiff's retaliation claim failed where she "never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint about the wage and hour practices of her employer and asserting a right adverse to the company.").

Likewise, Bonillas has not shown that he engaged in protected activity within the meaning of the participation clause.  "The purpose of section 2000e-3's participation clause 'is to protect the employee who utilizes the tools provided by Congress to protect his rights.'"  Vasconcelos v. Meese, 907 F.2d 111, 113 (9th Cir. 1990) (quoting in part Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978)).  As such, the Ninth Circuit has held that the participation clause applies only where the employee is involved in proceedings before the EEOC.  See Vasconcelos, 907 F.2d at 113 ("Accusations made in the context of charges before the [EEOC] are protected by statute; charges made outside that context are made at the accuser's peril.").  In this case, there is no dispute between the parties that Bonillas was not involved in any EEOC (or FEHA) process.  He therefore cannot show that he engaged in protected activity within the meaning of the participation clause.

### b)    Pretext

As set forth above, UAL has shown that it had a legitimate, legally permissible reason for its hiring decision, which thereby shifts the burden to Bonillas to show that UAL's explanation was a pretext for retaliation.  As discussed, UAL declined to offer the Supervisor position to Bonillas based on his poor prior performance in that role, coupled with his weak showing in the TAS selection process.  To show that UAL's proffered explanation for its decision was pretextual, Bonilla "must put forward specific and substantial evidence challenging the credibility of the employer's motives."  Vasquez, 349 F.3d at 642.

Bonillas contends that prior to 2010, he had "no documented performance issues" or allegations of dishonesty—and that it was not until he became involved in addressing employee issues relating to Scheele that he received his first negative evaluation.  Bonillas Decl. ¶ 34; Opp'n at 12-13.[15]  Perhaps so, but his prior evaluations were far from laudatory.  Although the 2008 evaluation prepared by Bonillas' then supervisor included a few positive and motivational comments, Bonillas' overall rating was only a "3" (average).  Notably, Bonillas scored a "2" (below average) in several areas, including leadership, conflict resolution, and meeting performance targets.  Sklanka Dep. 30:2-4, 30:9-34:24, and Ex 1.  For the 2009 evaluation, Bonillas again received an overall performance of "3," with a score of "2" in the areas of safety, performance, and costs.  Id. 35:4-19, 36:4-12.  In view of Bonillas' lukewarm performance reviews for 2008 and 2009, his Underperforms evaluation in 2010 can hardly be characterized as a pretextual "sudden displeasure" with his performance, as Bonillas has claimed.  Opp'n at 14.

Finally, Bonillas alleges that, upon becoming his supervisor, Holder began to "strip" him of responsibilities.  Opp'n at 16.  In particular, he claims that Holder would not

---

[15] Bonillas' assertion that he had no documented performance issues in his first twenty-four years with UAL misses the mark.  From 1986 to 2008, Bonillas worked as a Mechanic.  Opp'n at 14.  The performance reviews in question pertain to Bonillas' performance as a Supervisor.  Therefore, Bonillas' performance as Mechanic is not germane to whether he was sufficiently performing his duties as a Supervisor.

recognize him as a Supervisor, refused to consider his input on operational matters, and allowed two individuals to apply for Bonillas' Supervisor position even though they allegedly were not qualified.  Id. at 16-17; Bonillas Dep. 217:17, 220:7-230:2.  Accepting these claims at face value, no evidence is cited that would even remotely suggest that any of these actions were in retaliation for Bonillas having engaged in protected activity.  In the absence of such facts, Bonillas' claim of pretext fails to survive summary judgment.  See Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995) ("conclusory or speculative testimony [of pretext] is insufficient to raise a genuine issue of fact to defeat summary judgment.").

### D.  RETALIATION UNDER FEHA

The anti-retaliation provision of FEHA prohibits employers from taking any adverse employment action against an employee who "has opposed any practices forbidden under [§ 12940] or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  Cal. Gov't Code § 12940(h).  "To state a claim of retaliation under FEHA, a plaintiff must show:  (1) he engaged in a protected activity, (2) he was subjected to an adverse employment action, and (3) there is a causal link between the protected activity and the adverse employment action."  Rope v. Auto-Chlor Sys. of Wash., Inc., 220 Cal.App.4th 635, 651 (2013).  FEHA applies Title VII standards for retaliation claims.  Nidds v. Schindler Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996); Flait v. N. Am. Watch Co., 3 Cal.App.4th 467, 475-76 (1992) (same).

"The statutory language of section 12940(h) indicates that protected conduct can take many forms."  Yanowitz v. L'Oreal USA, Inc., 36 Cal.4th 1028, 1042 (2005).  At the same time, "case law and FEHA's implementing regulations are uniformly premised on the principle that the nature of activities protected by [§ 12940(h)] demonstrate some degree of opposition to or protest of the employer's conduct or practices based on the employee's reasonable belief that the employer's action or practice is unlawful."  Rope, 220 Cal. App. 4th at 652-53.  Here, there is no evidence that Bonillas, in the course of investigating the complaints against Scheele, demonstrated any opposition or protest with respect to UAL's

1   handling of the Scheele matter, nor is there any evidence that Bonillas reasonably believed

2   that UAL was acting in an unlawful manner.  At most, the evidence shows that Bonillas

3   was doing nothing more than following up on employee complaints as part of his duties as

4   a Supervisor.  As in the case of his claim under Title VII, Bonillas' showing is insufficient

5   to demonstrate a genuine issue of material fact with respect to his retaliation claim under

6   FEHA.

7       **E.    RULE 56(D)**

8       In the conclusion to his opposition, Plaintiff makes a one-sentence argument that, if

9   UAL's motion is not denied, he is entitled to a continuance under Federal Rule of Civil

10  Procedure 56(d) to conduct additional discovery.  Opp'n at 27.  The party seeking a Rule

11  56(d) continuance bears the burden of proffering facts sufficient to satisfy its requirements.

12  Nidds, 113 F.3d at 921.  "The requesting party must show: (1) it has set forth in affidavit

13  form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist;

14  and (3) the sought-after facts are essential to oppose summary judgment."  Family Home

15  and Finance Cntr., Inc. v. Fed. Home Loan Mortg. Corp., 525 F.3d 822, 827 (9th Cir.

16  2008).  Failure to comply with these requirements is an appropriate ground upon which to

17  deny a Rule 56(d) request.  Id.  The decision of whether to grants such a continuance is a

18  matter of the Court's discretion.  See Getz v. Boeing Co., 654 F.3d 852, 867-68 (9th Cir.

19  2011).

20      As an initial matter, Bonillas failed to submit an affidavit in support of his request,

21  as required by Rule 56(d), which, standing alone, is fatal to his request.  State, ex rel Cal.

22  Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 779 (9th Cir. 1998) (failure

23  to submit the requisite affidavit under Rule 56(f) (now 56(d)) "provides an adequate ground

24  for us to affirm the district court's denial.").  Moreover, beyond making a perfunctory

25  request for a continuance, offered any explanation regarding what additional discovery is

26  needed to oppose UAL's motion.  The lack of any such argument also militates in favor of

27  denying a continuance.  See Nicholas v. Wallenstein, 266 F.3d 1083, 1088-89 (9th Cir.

28  2001) (holding that the district court did not abuse its discretion in denying motion for

1  continuance under Rule 56(f) where plaintiffs had already conducted a large amount of

2  informal discovery and where they did not make clear what information was sought and

3  how it would preclude summary judgment); Margolis v. Ryan, 140 F.3d 850, 853-54 (9th

4  Cir. 1998) (affirming denial of a motion for continuance under Rule 56(f) where plaintiff

5  did not provide any basis or factual support for his assertions that further discovery would

6  lead to the facts and testimony he described, and his assertions appeared based on nothing

7  more than "wild speculation").  Bonillas' Rule 56(d) request is therefore denied.[16]

8  **IV.**   **CONCLUSION**

9      Plaintiff has failed to demonstrate the existence of a genuine issue of material fact

10 with respect to any of substantive claims for discrimination or retaliation.[17]  Accordingly,

11     IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment is

12 GRANTED.  The Clerk shall close the file.

13     IT IS SO ORDERED.

14 Dated:  August 4, 2014

15                                   SAUNDRA BROWN ARMSTRONG
                                      United States District Judge

16

17

18

19 ───────────────────

20     [16] In an apparent attempt to circumvent the requirements of Rule 56(d), Bonillas
separately filed an administrative motion to submit supplemental briefing based on the
production by UAL on April 10, 2014, of additional documents pertaining to the TAS

21 hiring process.  Dkt. 133. In said motion, which was filed well after the close of briefing on
the instant motion, Bonillas claimed that these documents show that two other employees

22 who were rated as Underperforms were retained in their positions.  See Patten Decl. in
Supp of Pl.'s Adm. Mot. to Request Add'l Briefing Schedule ¶¶ 12, 13, Dkt. 133-1.  He

23 further claimed that another Hispanic Supervisor was not retained based on an
Underperforms rating.  Id. ¶ 17.  Bonillas made no showing that any of these documents is

24 admissible or that that he is similarly-situated to these individuals—none of whom worked
in the same Components group at the SFO Maintenance facility as Bonillas.  Cotner Decl.

25 ¶ 4, Dkt. 135.  Further, no evidence was presented showing that these individuals had the
same qualifications or interviewed as poorly as Bonillas.  The Court thus denied Bonillas'

26 motion on June 26, 2014.  Dkt. 140.

27     [17] In view of the Court's determination that UAL is entitled to summary judgment on
all of Bonillas' substantive claims, the Court need not reach UAL's arguments regarding

28 his claim for punitive damages.