Tracy Thompson (SBN 88173)
 *tt@millerlawgroup.com*
Jennifer Cotner (SBN 255785)
 *jrc@millerlawgroup.com*
MILLER LAW GROUP
A Professional Corporation
111 Sutter Street, Suite 700
San Francisco, CA 94104
Tel. (415) 464-4300
Fax (415) 464-4336

Attorneys for Defendant
UNITED AIRLINES, INC.
(f/k/a United Air Lines, Inc.)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL BONILLAS, an individual, | Case No.: 4:12-cv-06574-SBA |
| Plaintiff, | |
| v. | **DECLARATION OF TRACY THOMPSON IN SUPPORT OF DEFENDANT'S MOTION FOR ATTORNEYS' FEES** |
| UNITED AIR LINES, INC. and DOES 1 through 10, inclusive, | Date:     October 14, 2014 |
| Defendants. | Time:     1:00 p.m. |
| | Judge:    Hon. Saundra B. Armstrong |
| | Ctrm:     1 |
| | Complaint filed:  December 31, 2012 |

I, Tracy Thompson, declare as follows:

      1.     I am an attorney licensed to practice law in California and a shareholder of Miller Law Group, Professional Corporation, counsel of record for Defendant United

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

1

Airlines, Inc.  I am lead counsel in this action.  I make this declaration based on personal knowledge.  If called as a witness, I could and would testify competently to the following.

2.      From the inception of this case through the Court's order granting Defendant's Motion for Summary Judgment,  this matter has been aggressively prosecuted by Plaintiff, resulting in Defendant's having had to expend considerable time, costs and attorneys' fees in defending against Plaintiff's discrimination claims, including his disability discrimination claims, over the course of the last eighteen months.   Plaintiff's actions have included the service of multiple unduly broad and burdensome document requests, the demand that Defendant expend time and resources undertaking an expensive  and time-consuming search for ESI (which ultimately yielded little in the way of additional documents beyond those already produced), the production by Plaintiff of many thousands of pages of completely irrelevant documents, a lack of cooperation in resolving even simple matters such as the scheduling of Plaintiff's deposition, multiple discovery disputes,  and associated meet and confer discussion and discovery motions.

3.      As an initial matter, our firm responded to Plaintiff's written discovery requests by reviewing many thousands of pages of documents, and ultimately producing approximately 10,796 pages of documents to Plaintiff's counsel.  These documents included thousands of pages of Plaintiff's medical records, which presumably were sought because of Plaintiff's claim of disability discrimination based on an alleged diagnosis of PTSD.

4.      Following the initial production of documents, which included email correspondence, Plaintiff's counsel demanded that Defendant undertake a further search for ESI.  As a result of this demand, Defendant was required to retain an outside vendor to assist in the retrieval and preliminary review of thousands of pages of additional ESI, the vast bulk of which turned out to be duplicative of the ESI that Defendant had already produced.  Defendant was forced to expend many hours of attorney and paralegal time, as

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

DECLARATION OF TRACY THOMPSON IN SUPPORT OF DEFENDANT'S MOTION FOR ATTORNEYS' FEES
Case No.: 4:12-cv-06574-SBA

1  well as to incur the substantial costs charged by its ESI vendor. These ESI vendor costs

2  are included in Defendant's Bill of Costs submitted to the Court.

3

4         5.     Plaintiff produced a total of 23,181 documents in this single plaintiff

5  discrimination case. Of those, more than 21,000 were ESI that Plaintiff produced in several

6  different productions. The vast bulk of this production was utterly irrelevant to any of the

7  issues in this lawsuit. Moreover, attorneys and paralegals at our firm were forced to spend

8  dozens of hours attempting to understand what documents had been produced because of

9  Plaintiff's multiple productions of ESI, his incorrect Bates-numbering, gaps in Bates-

10  numbering, duplicative Bates-numbering, and reordering of documents. Plaintiff's failure to

11  follow basic and well-accepted conventions with regard to the production and sequential

12  Bates-numbering of documents created substantial and on-going confusion for Defendant,

13  and resulted in numerous hours of attorney and paralegal time being spent in an effort to

14  sort out what had occurred and to manage the enormous productions.

15

16         6.     As part of discovery into Plaintiff's disability discrimination claims, we

17  also subpoenaed and reviewed hundreds of pages of medical records from Plaintiff's

18  numerous health care and workers' compensation providers. Due to Plaintiff's lack of

19  cooperation with respect to this process, Defendant was forced to incur many hours of

20  attorneys time simply seeking to have Plaintiff provide us with authorizations for the release

21  of these records.

22

23         7.     Plaintiff was finally deposed on January 15, 2014, just a few short

24  weeks before fact discovery cut-off, but only after Defendant was forced to file a motion to

25  compel his attendance after many attorney hours spent trying to secure Plaintiff's voluntary

26  cooperation. (The Magistrate Judge granted Defendant's motion to compel and ultimately

27  awarded Defendant $9,827.10 in sanctions against Plaintiff's counsel for Defendant's fees

28  incurred in bringing the motion. Plaintiff's appeal of the Magistrate's Order is currently

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

pending before the Court.)

8.      During that deposition, Plaintiff admitted that he had no factual support for his claim that he had been discriminated against on the basis of his alleged PTSD, because he conceded facts which established that he had never told the decision-makers about PTSD or any other alleged disability.  Instead, Plaintiff testified that the only person whom he had ever explicitly told he had PTSD was his former manager, Kenneth Holder, who was not involved in the adverse action alleged in the Complaint.  I took the deposition of Plaintiff Raul Bonillas on January 15, 2014.  The deposition was transcribed by a certified Shorthand Reporter.  True and correct copies of excerpted portions of Plaintiff's certified deposition transcript is attached to this declaration as **Exhibit 1**.

9.      Defendant argued in its Motion for Summary Judgment, filed on February 11, 2014, that, because Holder was not involved in the decision not to select Plaintiff for the Supervisor position at issue, and because the decision-makers had no knowledge of any alleged disability, Defendant was entitled to judgment on Plaintiff's disability discrimination claims as a matter of law.

10.      It is undisputed that Plaintiff knew, since before the outset of this case, that Holder was not involved in the decision not to select him for a Supervisor position because, during his deposition, he testified that he knew Holder had ceased being his manager several months before Plaintiff had even applied for the position at issue; he further testified that he had actually lobbied to save Holder's job.  *See* Ex. 1.

11.      In addition, Plaintiff had propounded an interrogatory asking Defendant for the name of "[e]ach and every person who had any input or participated in any way in the decision."  Defendant responded on October 29, 2013, providing the names of the relevant decision makers; Holder was not included.  A true and correct copy of Defendant's

M̲ILLER L̲AW G̲ROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

verified Amended Responses to Plaintiff Raul Bonillas' Interrogatories, Set One, is attached to this declaration as **Exhibit 2.**

12.     United employee Kenneth Holder was deposed on January 29, 2014, and testified that he had been displaced from his position at the San Francisco Maintenance Base in around early 2011.  I defended the deposition of Kenneth Holder on Wednesday, January 29, 2014.  The deposition was transcribed by a certified Shorthand Reporter.  True and correct copies of excerpted portions of Mr. Holder's certified deposition transcript  are attached to this declaration as **Exhibit 3**.

13.     Around the time of Plaintiff's deposition, Defendant conducted further discovery with regard to Plaintiff's disability discrimination claims.   Defendant had to subpoena and depose three health care providers whom Plaintiff had identified in his discovery responses. In addition, Defendant retained a psychiatric expert witness to rebut Plaintiff's claim that he suffered from PTSD.  Around this same time period, and before the close of fact discovery on February 11, and expert discovery on March 27, 2014, Plaintiff's counsel engaged Defendant in extensive meet and confer sessions, a number of discovery-related motions and administrative motions, and also filed a pointless motion for summary adjudication of Defendant's affirmative defenses.

14.     The trial in this action was originally scheduled to begin on June 23, 2014.  It was continued by the Court on two occasions, and the parties also stipulated to a one-week continuance due to scheduling conflicts.  Before the Court ultimately took the trial off calendar on August 4, 2014, trial was set to begin on September 29, 2014, with pretrial disclosures due on August 5, 2014.

15.     As part of the parties' duty to meet and confer in advance of these pretrial disclosures, they discussed ways to clarify and narrow the issues for trial.  Plaintiff's

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

counsel, finally acknowledging the baselessness of Plaintiff's disability discrimination claims, offered to dismiss them for a waiver of costs on July 28, 2014.  A true and correct copy of Plaintiff's counsel's letter is attached to this declaration as **Exhibit 4**.

16.     Defendant refused to waive its right to seek its costs in defending these claims, and Plaintiff never dismissed them.

17.     Defendant served the report of its psychiatric expert, Dr. Bernard Rappaport, on February 6, 2014. The report concluded that Plaintiff never had PTSD in the first place, and was not suffering from PTSD at the time of the adverse action alleged. Plaintiff's counsel did not submit an expert report to rebut this conclusion.

18.     On March 22, 2014, I deposed Dr. Roy Curry, a psychiatrist whom Plaintiff had identified as having examined him on several occasions, including as recently as 2013 while this case was pending. Dr. Curry testified in his deposition that, in his opinion, Plaintiff had never suffered from PTSD.

19.     Five attorneys other than myself have worked on various aspects of this matter since early 2013:  Jenny Cotner; Mary Guilfolye, who was brought in primarily to assist on ESI  and other discovery while Ms. Cotner was getting married and on her honeymoon; Mani Sheik, a mid-level associate; Janine Simerly, who was brought in to assist in the trial of this matter in late July due to Ms. Cotner's maternity leave which was then scheduled to start on August 30, 2014; Joseph Mascovich, an appellate specialist who was brought in to assist on discrete matters relating to the motion for summary judgment and  trial preparation;  Heather McClimon, a paralegal; and Mary-Anne Quintos Reyes who took over Ms. McClimon's paralegal responsibilities when she left the firm.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

**DECLARATION OF TRACY THOMPSON IN SUPPORT OF DEFENDANT'S MOTION FOR ATTORNEYS' FEES**
**Case No.: 4:12-cv-06574-SBA**

1     20.    I am a shareholder with Miller Law Group, and lead attorney on this

2 matter. I am a 1979 graduate of the University of Virginia School of Law. I have over 30

3 years' experience representing employers in all areas of labor and employment law. I

4 formerly worked with the law firms of Brobeck, Phleger & Harrison LLP; Sheppard Mullin

5 Richter & Hampton LLP; Morgan Lewis & Bockius LLP; and Cook Roos Wilbur Thompson

6 LLP. During my years of practice, I have gained general familiarity with the rates charged

7 by attorneys with experience comparable to mine who practice in the Bay Area. Based on

8 this knowledge, my rate of $372/hour for this matter is equal to or less than the rates

9 charged by these attorneys.

11     21.    Janine Simerly, a shareholder with Miller Law Group, graduated cum

12 laude from Loyola University Law School in 1977. Before joining Miller Law Group,

13 Ms. Simerly was an associate and partner at Bronson, Bronson & McKinnon and then was a

14 partner at Seyfarth Shaw. Ms. Simerly is a member of the prestigious American Board of

15 Trial Advocates, and has tried over 35 jury trials to verdict. During my years of practice, I

16 have gained general familiarity with the rates charged by attorneys with experience

17 comparable to that of Ms. Simerly who practice in the Bay Area. Based on this knowledge,

18 Ms. Simerly's rate of $372/hour for this matter is equal to or less than the rates charged by

19 these attorneys.

21     22.    Mr. Sheik was an associate with Miller Law Group and 2006 graduate

22 of the University of California, Berkeley School of Law. During my years of practice, I have

23 gained general familiarity with the rates charged by attorneys with experience comparable to

24 that of Mr. Sheik who practice in the Bay Area. Based on this knowledge, Mr. Sheik's rate

25 of $288/hour for this matter is equal to or less than the rates charged by these attorneys.

27     23.    Ms. Guilfoyle is a Special Counsel with the Miller Law Group and is a

28 1989 graduate of the University of California, Hastings College of the Law. Prior to working

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

**DECLARATION OF TRACY THOMPSON IN SUPPORT OF DEFENDANT'S MOTION FOR ATTORNEYS' FEES**
**Case No.: 4:12-cv-06574-SBA**

at the Miller Law Group, Ms. Guilfoyle worked at Epstein Becker & Green, and Hancock Rothert & Bunshoft (now Duane Morris).  During my years of practice, I have gained general familiarity with the rates charged by attorneys with experience comparable to that of Ms. Guilfoyle who practice in the Bay Area.  Based on this knowledge,  Ms. Guilfoyle's rate of $320/hour for this matter is equal to or less than the rates charged by these attorneys.

24.    Mr. Mascovich is a Special Counsel with the Miller Law Group and is a 1980 graduate of Hastings College of the Law, where he was admitted to the Order of the Coif.  Mr. Mascovich worked for more than 20 years as an associate and shareholder at Crosby, Heafey, Roach & May (since merged into Reed Smith), where he began specializing in appellate practice in the mid-1980s.  Mr. Mascovich is a certified specialist in appellate law by the State Bar of California Board of Legal Specialization, and is a member of the California Academy of Appellate Lawyers.   During my years of practice, I have gained general familiarity with the rates charged by attorneys with experience comparable to that of Mr. Mascovich who practice in the Bay Area.   Based on this knowledge, Mr. Mascovich's rate of $356/hour for this matter is equal to or less than the rates charged by these attorneys.

25.    Both paralegals who worked on this matter, Mary Anne Quintos-Reyes and Heather McClimon, are experienced paraprofessionals.  During my years of practice, I have gained general familiarity with the rates charged by paraprofessionals with experience comparable to that of Ms. McClimon and Ms. Quintos-Reyes who practice in the Bay Area. Based on this knowledge, their rate of $135/hour for this matter is equal to or less than the rates charged by these paraprofessionals.

26.    Our firm has to date incurred $15,020 in attorneys' fees in drafting this Motion for Attorneys' Fees and supporting declarations, including 30 hours by Jennifer Cotner at $320/hour ($9,600), 10 hours by Joseph Mascovich at $356/hour ($3560) and 5

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

8

hours by myself at $372/hour ($1860). I anticipate that Mr. Mascovich will spend an additional 10 hours ($3560) in drafting the Reply to this Motion, and I will spend an additional 8 hours ($2976) in preparing the Reply and attending the hearing on this Motion, for a total of $21,556 incurred in preparing and filing this Motion for Attorneys' Fees.

27.    On Monday morning, August 25, 2014, I sent an email to Plaintiff's attorneys, Dow Patten and Spencer Smith, giving them notice that Defendant intended to file a Motion for Attorneys' Fees, and inviting them to meet and confer with respect to this matter pursuant to Civil Local Rule 54-5.  After not hearing from them, I wrote another email on Tuesday, August 26, again inviting them to meet and confer.  Late that same day, I received a faxed letter from Mr. Patten, asking for specific authority for Defendant's Motion, along with Defendant's billing records, before he would agree to meet and confer regarding the motion.  The next morning, on August 26, I responded by email by providing the requested details and authority, and again offered dates to meet and confer.  I also informed Plaintiff's counsel that we would not be providing them with our firm's billing records as part of the meet and confer process.  I heard nothing further from Plaintiff's counsel following my August 26, 2014, email with regard to this motion.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on September 2, 2014, in San Francisco, California.

                                        /s/ Tracy Thompson
                                        Tracy Thompson

4826-4731-7021, v. 1

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

9

**EXHIBIT 1**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAUL BONILLAS, an individual,

             Plaintiff,            CASE NO.

     vs.                       C 12 6574

UNITED AIR LINES, INC. AND
DOES 1 through 10, inclusive,

             Defendants.

_____/

DEPOSITION OF RAUL D. BONILLAS

VOLUME I

January 15, 2014

Reported by:
WENDY C. BROWN, CSR
LICENSE NO. 5697

PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
3533 Castro Valley Boulevard, Suite G
Castro Valley, California 94546
(510) 885-2371 Fax: (510) 247-9775

1   Q.      Did that change at some point?

2   A.      And then it changed to Shannon Wagner.

3   Q.      And what title did Mr. Wagner have, if you know?

4   A.      The same as Bonnie, the director of components

5   shops.

6   Q.      Okay.  And how long did you continue to report

7   to Ken Holder as your manager?

8   A.      I think sometime around January -- what I

9   recall, it's around January of 2011, is when he was

10  replaced.

11  Q.      Let me make sure I understand what you just

12  said.  It's your belief that Mr. Holder stopped being

13  your manager in about January of 2011?

14  A.      No, maybe that's -- maybe a correct -- maybe

15  it's around November, I'm not sure.  December, I'm not

16  sure.  I'm not sure.  I know it was towards the end of

17  2010.

18  Q.      I'm getting a little confused here now by what

19  you're saying.  Are you saying that Mr. Holder stopped

20  being your manager around the end of 2010?

21  A.      Yes.

22  Q.      Okay.  I'll try the -- what makes you think it

23  was the end of 2010?

24  A.      I mean, I just don't really exactly remember

25  when he left.  I just know he was there for a short

1    time, and it was only a few months.

2    Q.      So your recollection is that Mr. Holder was your

3    manager for only a few months?

4    A.      Yes.

5    Q.      Right?

6    A.      Yes.

7    Q.      And then who was he replaced by?

8    A.      From -- he was replace -- he was not -- he -- he

9    was not selected -- he was not -- he was replaced by

10   Sinasi Stewart.

11   Q.      And your understanding was that Mr. Holder went

12   through the talent selection process, right?

13          MR. PATTEN:   Vague as to "talent selection

14   process."

15          THE WITNESS:   I just knew he was replaced by

16   Sinasi Stewart.

17          MS. THOMPSON:   Q.   And you know that -- you knew

18   that he lost -- that Ken Holder lost his job, right?

19   A.      I knew that he got transferred to another job,

20   yes.

21   Q.      Do you know anything at all about the

22   circumstances surrounding that?

23   A.      No.

24   Q.      Never discussed it with Mr. Holder?

25   A.      No.

1   Q.      Okay.   When did Mr. Stewart, Sinasi Stewart,

2   become your manager, approximately?

3   A.      Um, early 2011.

4   Q.      And did Mr. Stewart remain your manager until

5   you became a mechanic again?

6   A.      Yes.

7   Q.      So he remained your supervisor until about

8   October 1, 2011, right?

9   A.      Yes.

10  Q.      And do you remember when Shannon Wagner assumed

11  the position of director over your group?

12  A.      I think around the -- towards the end of 2010.

13  Q.      Okay.  So if I told you it was around February

14  of 2011, would you think that was wrong?

15  A.      Um, let me think.  I'm trying to think here.  I

16  just know that when Ken Holder was there, that's when

17  Shannon Wagner was there.

18  Q.      So Ken Holder and Shannon Wagner were there at

19  approximately the same time as each other?

20  A.      Um, for part of it, yes.

21  Q.      Okay.  What time period did they overlap?

22  A.      Um, hmm, I can't -- I'm not really sure when

23  Shannon left, though.  I'm not really sure when he left.

24  I know it was 2011, but I just -- what I remember, it

25  was early 2011.

1         THE WITNESS:  I think he was trying -- I think

2    he was trying to help me with my performance.

3         MS. THOMPSON:  Q.  Okay.  Thank you.  In fact,

4    you thought Ken Holder was supportive of you while he

5    was your manager, didn't you?

6         MR. PATTEN:  Vague and ambiguous as to

7    "supportive."

8         THE WITNESS:  No.

9         MS. THOMPSON:  Q.  You don't think he was.  Did

10   you ever tell anyone that Ken Holder was supportive of

11   you while he was your manager?

12        MR. PATTEN:  Vague as to "supportive."

13        Go ahead.

14        THE WITNESS:  I remember that I told Shannon

15   that I was trying to support him not losing his job, so

16   I told him that, you know, "You should keep him, 'cause,

17   you know, he needs to" -- "he's trying to do a good

18   job."

19        MS. THOMPSON:  Q.  This is a comment that you

20   made to Shannon Wagner about Ken Holder?

21   A.      I remember saying that, yeah, I think, like,

22   "Why are you letting him go, because he's trying to do

23   his job."

24   Q.      And you were being truthful when you said that,

25   I take it, or were you lying?

1   Q.      But you were advocating for him to keep his job

2   to his boss, Shannon Wagner?

3          MR. PATTEN:  Vague as to "advocating."

4   Mischaracterizes the testimony, leading.

5          MS. THOMPSON:  Q.  Please answer the question.

6   A.      I just felt I didn't want to see somebody not

7   have a job.

8   Q.      All right.  I understand.

9          Have you ever heard anyone at United Airlines --

10  manager, supervisor -- make any derogatory comments,

11  jokes, slurs about PTSD?

12         THE WITNESS:  Read that again, please.

13         (The record was read as follows:

14         "Question:  Have you ever heard anyone at

15         United Airlines -- manager, supervisor --

16         make any derogatory comments, jokes, slurs

17         about PTSD?")

18         THE WITNESS:  Not that I can recall of, no.

19         MS. THOMPSON:  Q.  Okay.  Now, I'd like you -- I

20  take it that it's your opinion or belief, as you sit

21  here now, that your PTSD had something to do with your

22  not being given the supervisor position in October of

23  2011.  Is that right?

24  A.      Yes, that's what I think.

25  Q.      Okay.  So what I need you to do is tell me why

1  you believe that your not getting the supervisor

2  position in October 2011 had something to do with your

3  having been diagnosed with PTSD?

4  A.      I mean, I just -- I just -- what I think is

5  that I -- I don't think that they wanted me to continue

6  being a supervisor if I had that.   That's what I think.

7  Q.      Okay.  I understand, again, that that's your

8  opinion, but I need to know what leads you to form that

9  opinion.  What facts can you point to that lead you to

10  that conclusion that PTSD had anything to do with the

11  decision?

12  A.      I mean, I don't know any -- any supervisors

13  that have PTSD that have their job.  But I don't -- I

14  don't -- I don't -- I don't -- nobody else was cut

15  besides me.

16        MS. THOMPSON:  Can I have the question read

17  back, please?

18        (The record was read as follows:

19        "Question:  I understand, again, that that's

20        your opinion, but I need to know what leads

21        you to form that opinion.  What facts can

22        you point to that lead you to that

23        conclusion that PTSD had anything to do with

24        the decision?")

25        MR. PATTEN:  Asked and answered.

141

1          THE WITNESS:  I don't have anything further.

2          MS. THOMPSON:  Q.  Okay.  So that's what I'm

3     trying to understand, further than what?

4          MR: PATTEN:  Asked --

5          MS. THOMPSON:  Q.  Do you have anything that you

6     can point to that says -- suggests to you that, "my PTSD

7     had something to do with this position"?

8          MR. PATTEN:  Asked and answered.  This is

9     harassing.

10         THE WITNESS:  I don't have anything else at all.

11         MS. THOMPSON:  Q.  Okay.  So other than it's

12    just your belief, you have no facts to support that

13    belief; is that a fair statement?

14         MR. PATTEN:  Misstates testimony.

15         MS. THOMPSON:  Q.  Well, if you have some facts,

16    I do want you to tell me.  I understand you do have the

17    opinion, okay.  So what I'm trying to find out, can you

18    point to anything that would suggest to you there's any

19    kind of connection between the PTSD and the decision not

20    to allow you to be a supervisor?

21         MR. PATTEN:  Misstates testimony.

22         THE WITNESS:  I don't have anything that I -- I

23    could think of that.

24         MS. THOMPSON:  Q.  Okay.

25         Let's talk about Shannon Wagner.  How would you

1          MS. THOMPSON:  I'll reframe the question.

2    Q.       The question then is going to be, you obviously

3    hold this opinion that your disabilities had something

4    to do with your not being selected, right?

5    A.       Yes.

6    Q.       So what I want to know is why you believe that,

7    why you hold that belief.

8    A.       Because I think I'm perceived as not doing

9    things the way somebody without a disability does them.

10   Q.       Okay, and what makes you form that conclusion?

11   A.       Well, I mean, I was told that I wasn't doing

12   things -- you know, I was not doing things --

13   remembering things as well and doing other things as

14   well, and that I -- and so if I'm not -- if I was told

15   that, that then I think that my disability is being

16   looked at, and that's why I wasn't selected.

17   Q.       Did anyone ever tell you they were looking at

18   your disability and making any decision with regard to

19   whether you would be selected for the supervisor

20   position?

21   A.       Nobody told me that, no.

22   Q.       And just so we're clear, I think I asked you

23   this before, but you never asked for any kind of

24   accommodation, did you?

25          MR. PATTEN:  Objection; asked and answered.

1           MS. THOMPSON:  Q.  The period 2008 through 2011.

2           MR. PATTEN:  Asked and answered.  Answer it

3    again.  Calls for a legal conclusion.

4           Testify as to your understanding.

5           THE WITNESS:  I just remember the company -- I

6    don't remember specifically asking for accommodation.

7           MS. THOMPSON:  Q.  So let me -- just so we're

8    clear here, did you, at any time between 2008 and 2011,

9    ever ask for any accommodation to any kind of

10   disability?

11          MR. PATTEN:  This has been asked and answered.

12   You're going over the same material, Counsel.

13          Go ahead and answer it again.

14          THE WITNESS:  No.

15          MS. THOMPSON:  Q.  Okay.  Have you told me now

16   all the reasons why you believe your not being selected

17   for the supervisor position had something to do with a

18   disability?

19          MR. PATTEN:  Misstates testimony.

20          Go ahead.

21          THE WITNESS:  Yes.

22          MS. THOMPSON:  Q.  Is it your opinion or belief

23   that your not being selected for the supervisor position

24   in 2011 was an act of retaliation against you?

25   A.     Yes, I think I'm not being selected, yes,

CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.  Executed this 20th day of January, 2014.

_____
CERTIFIED SHORTHAND REPORTER
NO. 5697

**EXHIBIT 2**

1  Thompson (SBN 88173)
      tt@millerlawgroup.com
2  Jennifer Cotner (SBN 255785)
      jrc@millerlawgroup.com
3  MILLER LAW GROUP
   A Professional Corporation
4  111 Sutter Street, Suite 700
   San Francisco, CA 94104
5  Tel. (415) 464-4300
   Fax (415) 464-4336
6

7
   Attorneys for Defendant
8  UNITED AIRLINES, INC.
   (f/k/a United Air Lines, Inc.)
9

10                        UNITED STATES DISTRICT COURT

11                       NORTHERN DISTRICT OF CALIFORNIA

12

13  RAUL BONILLAS, an individual,            Case No.: 4:12-cv-06574-SBA
14
                Plaintiff,
15                                           **DEFENDANT UNITED AIRLINES, INC.'S
16  v.                                       AMENDED RESPONSES TO PLAINTIFF
                                             RAUL BONILLAS' INTERROGATORIES,
17  UNITED AIR LINES, INC. and DOES 1        SET ONE**
    through 10, inclusive,
18
                Defendants.
19
20                                           Complaint filed:  December 31, 2012
                                             Trial Date:    June 23, 2014
21

22

23  **PROPOUNDING PARTY:**      **Plaintiff RAUL BONILLAS**

24  **RESPONDING PARTY:**      **Defendant UNITED AIRLINES, INC.**

25  **SET NUMBER:**            **One (1)**

26

27

28

---

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant United Airlines, Inc., hereby amends its response to the Interrogatories propounded by Plaintiff Raul Bonillas as follows:

## PRELIMINARY STATEMENT

Defendant has not fully completed its investigation of the facts relating to this case, has not fully completed discovery in this action, and has not completed its preparation for trial.   Therefore, all of the responses contained herein are based only upon such information and documents as are presently available to and specifically known to Defendant. It is anticipated that further discovery, independent investigation, legal research, and/or analysis will supply additional facts, add meaning to known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions, changes, modifications or amendments to these responses.

The following responses are given without prejudice to Defendant's right to produce evidence of any additional fact or facts which Defendant may later discover. Defendant accordingly reserves its right to change any and all responses as additional facts are ascertained, analyses are made, legal research is completed and contentions are made.

## GENERAL OBJECTIONS

1.     Defendant objects to these Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, and/or the attorney work product doctrine.  Defendant will not produce any privileged or protected information.

/ / /

/ / /

/ / /

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

2.      Defendant objects to the Definition of the terms ""YOU" or "YOUR" on the ground that it is vague, ambiguous, and overbroad in that it seeks information well beyond the possession, custody or control of the Defendant.

3.      Defendant objects to the Definition of the term "IDENTIFY" on the grounds that it seeks an individual's full name, date of hire, date of birth, seniority ranking, national original and race, and, as such, it is not reasonably calculated to lead to the discovery of admissible evidence, and on the grounds that it seeks information, the production of which would invade the privacy rights, including those protected by the United States or California Constitutions, of current or former employees or other individuals who are not parties to this action, and it is unduly burdensome and oppressive.

**INTERROGATORY NO. 1:**

IDENTIFY each and every employee in the maintenance division at YOUR SFO location from January 1, 2010 to the present.

**RESPONSE TO INTERROGATORY NO. 1:**

Defendant objects to this Interrogatory on the ground that the phrase "maintenance division at YOUR SFO location" is vague and ambiguous. Defendant further objects to this Interrogatory on the ground that the defined term "IDENTIFY" seeks information that is not relevant to this lawsuit and is not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this Interrogatory on the grounds that it is unduly burdensome and oppressive. Defendant further objects to this Interrogatory on the ground that it is overbroad as to time and subject matter. Defendant further objects to this Interrogatory on the ground that it seeks the disclosure of information that would violate the constitutional privacy rights of Defendant's current and/or former employees and others who are not parties to this action.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

1    Subject to and without waiving the foregoing objections, Defendant responds as

2   follows: The answer to this Interrogatory may be determined by examining, auditing,

3   compiling, abstracting, or summarizing Defendant's records.  Therefore, pursuant to Federal

4   Rule of Civil Procedure 33(d) and the Protective Order in this case, Defendant will produce a

5   spreadsheet with a list of the employees in the Components Overhaul & Repair, Avionics and

6   Composites   groups (SFOLX, SFOOC, SFORQ, SFOEC and SFOLN), with names,

7   identifying information and irrelevant material redacted, from January 1, 2010 to the present.

8

9   **INTERROGATORY NO. 2**:

10    IDENTIFY each and every employee in the maintenance division at YOUR SFO

11   location who had a change in position due to the alleged reduction in force in or around

12   September of 2011.

13

14   **RESPONSE TO INTERROGATORY NO. 2:**

15    Defendant objects to this Interrogatory on the ground that it is vague,

16   ambiguous and unintelligible including, but not limited to, the phrases "the maintenance

17   division at YOUR SFO location" and "change in position."  Defendant further objects to this

18   Interrogatory on the ground that it seeks information that is not relevant to this lawsuit and is

19   not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further

20   objects to this Interrogatory on the grounds that it is unduly burdensome and oppressive.

21   Defendant further objects to this Interrogatory on the ground that it is overbroad as to subject

22   matter.  Defendant further objects to this Interrogatory on the ground that that the defined

23   term "IDENTIFY" seeks the disclosure of information that would violate the constitutional

24   privacy rights of Defendant's current and/or former employees and others who are not parties

25   to this action.

26   / / /

27   / / /

28   / / /

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

1   **INTERROGATORY NO. 3**:

2   IDENTIFY each and every person who had any input into or participated in any

3   way in the decision to demote Plaintiff, including, but not limited to those who made the actual

4   decision and those who, directly, or indirectly supplied information to the decision-makers.

5

6   **RESPONSE TO INTERROGATORY NO. 3**:

7   Defendant objects to this Interrogatory on the grounds that the phrases "had

8   input into or participated in any way" and "directly or indirectly supplied information" are vague

9   and ambiguous and overbroad.  Defendant further objects to this Interrogatory on the ground

10  that the defined term "IDENTIFY" seeks the disclosure of information that would violate the

11  constitutional privacy rights of Defendant's current and/or former employees and others who

12  are not parties to this action.  Defendant further objects to this Interrogatory on the ground

13  that it assumes facts not in evidence as Plaintiff was not demoted.  Defendant further objects

14  to this Interrogatory to the extent that it seeks information protected from disclosure by the

15  attorney-client privilege, the work product doctrine, or any other applicable privilege or

16  immunity.  Such privileged information will not be produced.

17  Subject to and without waiving the foregoing objections, Defendant responds as

18  follows:  The hiring managers for the Supervisor – Component Overhaul and Repair – SFO

19  (Technical Operations) (MAIN1120-RT) position that Plaintiff applied for were Bill Fulton and

20  Sinasi Stewart. Shannon Wagner approved the decision.  Rachel Telson made information

21  available to Fulton and Stewart during the interview process and screened out the least

22  competitive applicants for the position (including Plaintiff), who would not be offered

23  interviews for the position.  Despite this, Fulton and Stewart chose to interview Plaintiff for the

24  position, with the support and agreement of Wagner.

25

26  **INTERROGATORY NO. 4**:

27  For each and every person who had any input into or participated in any way in

28  the decision to demote Plaintiff, describe or explain that person's role in the decision to

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

1  demote Plaintiff, including but not limited to, whether he or she made the decision to demote

2  Plaintiff and/or supplied information upon which the decision was based.

3

4  **RESPONSE TO INTERROGATORY NO. 4:**

5          Defendant objects to this Interrogatory on the grounds that the phrases "had any

6  input or participated in any way" and "supplied information upon which the decision was

7  based" are vague and ambiguous and overbroad.   Defendant further objects to this

8  Interrogatory on the ground that it assumes facts not in evidence as Plaintiff was not

9  demoted. Defendant further objects to this Interrogatory to the extent that it seeks information

10  protected from disclosure by the attorney-client privilege, the work product doctrine, or any

11  other applicable privilege or immunity.  Such privileged information will not be produced.

12          Subject to and without waiving the foregoing objections, Defendant responds as

13  follows:  The hiring managers for the Supervisor – Component Overhaul and Repair – SFO

14  (Technical Operations) (MAIN1120-RT) position that Plaintiff applied for were Bill Fulton and

15  Sinasi Stewart. Shannon Wagner approved the decision.  Rachel Telson made information

16  available to Fulton and Stewart during the interview process and screened out the least

17  competitive applicants for the position (including Plaintiff), who would not be offered

18  interviews for the position. Despite this, Fulton and Stewart chose to interview Plaintiff for the

19  position, with the support and approval of Wagner.

20

21  **INTERROGATORY NO. 5:**

22          Describe in detail Plaintiff's job duties at the time of his demotion.

23

24  **RESPONSE TO INTERROGATORY NO. 5:**

25          Defendant objects to this Interrogatory on the ground that it assumes facts not in

26  evidence as Plaintiff was not demoted.

27          Subject to and without waiving its foregoing objections, Defendant responds as

28  follows:   The answer to this Interrogatory may be determined by examining, auditing,

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

1   compiling, abstracting, or summarizing Defendant's records.  Therefore, pursuant to Federal

2   Rule of Civil Procedure 33(d), Defendant has produced the job description for Supervisor –

3   Component Overhaul and Repair – SFO (Technical Operations) effective at the time that

4   Plaintiff applied for the Supervisor position in 2011, Bates stamped as United/Bonillas-

5   000890-000893.

6

7   **INTERROGATORY NO. 6:**

8           IDENTIFY the person(s) who took over any and all of Plaintiff's job duties after

9   his demotion.

10

11  **RESPONSE TO INTERROGATORY NO. 6:**

12          Defendant objects to this Interrogatory to the extent that the phrase  "took over

13  any and all of Plaintiff's job duties" is vague and ambiguous and overbroad.   Defendant

14  further objects to this Interrogatory on the ground that the defined term "IDENTIFY" seeks the

15  disclosure of information that would violate the constitutional privacy rights of Defendant's

16  current and/or former employees and others who are not parties to this action.   Defendant

17  objects to this Interrogatory on the ground that is assumes facts not in evidence as Plaintiff

18  was not demoted.

19          Subject to and without waiving its foregoing objections, Defendant responds as

20  follows:  James Varghese, Felipe Mendoza, Kim Taylor, Mohammed Buksh, Terrance Kranitz,

21  Anthony Shevchenko, George Constantineau, Hector Santiago, Michael Moore, Michael

22  Lindemann, Michael Lanza, Yvonne Pierce, David Ferreira, Ian Paul Chin, Arif Suchedina and

23  Marshall Ian Hunt held the job title Supervisor – Component Overhaul and Repair – SFO

24  (Technical Operations) in Bill Fulton and Sinasi Stewart's groups by the end of 2011 and

25  therefore performed similar job duties to what Plaintiff performed when he was a Supervisor.

26  / / /

27  / / /

28  / / /

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

DEFENDANT UNITED AIRLINES, INC.'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET ONE
Case No.: 4:12-cv-06574-SBA

1    **INTERROGATORY NO. 7**:

2          IDENTITY all person(s) who performed the exact or similar job duties as Plaintiff

3    immediately before the decision to demote him within YOUR SFO location.

4

5    **RESPONSE TO INTERROGATORY NO. 7**:

6          Defendant objects to this Interrogatory on the ground that the phrase "performed

7    the exact or similar job duties" and "YOUR SFO location" are vague and ambiguous and

8    overbroad.  Defendant further objects to this Interrogatory on the ground that the defined term

9    "IDENTIFY" seeks the disclosure of information that would violate the constitutional privacy

10   rights of Defendant's current and/or former employees and others who are not parties to this

11   action.  Defendant objects to this Interrogatory on the ground that is assumes facts not in

12   evidence as Plaintiff was not demoted.

13         Subject to and without waiving its foregoing objections, Defendant responds as

14   follows:  In addition to Plaintiff, James Varghese, Felipe Mendoza, Kim Taylor, Mohammed

15   Buksh, Terrance Kranitz, Anthony Shevchenko, George Constantineau, Hector Santiago,

16   Andrew Lindemann, Michael Lanza, Yvonne Pierce, David Ferreira, Arif Suchedina and

17   Marshall Ian Hunt held the job title Supervisor – Component Overhaul and Repair – SFO

18   (Technical Operations) in Bill Fulton and Sinasi Stewart's group immediately preceding the

19   Talent and Selection ("TAS") process in this group in 2011, and therefore performed job

20   duties similar to Plaintiff during that time period.

21

22   **INTERROGATORY NO. 8**:

23         Describe with specificity the process and/or criteria YOU used to determine

24   which employees and/or positions were to be affected by alleged reductions in force at your

25   SFO division in or around September 2011.

26   / / /

27   / / /

28   / / /

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

7

**RESPONSE TO INTERROGATORY NO. 7:**

Defendant objects to this Interrogatory to the extent that it is vague and ambiguous and unintelligible, as every manager and supervisor at the newly-merged company went through the TAS process in one way or another. Therefore, it is impossible to "describe with specificity" the process or criteria used to determine which employees would be affected by the TAS process. Defendant further objects to this Interrogatory on the ground that it seeks information that is not relevant to this lawsuit and is not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this Interrogatory on the grounds that it is unduly burdensome and oppressive. Defendant further objects to this Interrogatory on the ground that it is overbroad as to subject matter. Defendant further objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Such privileged information will not be produced.

Dated: October 29, 2013

MILLER LAW GROUP
A Professional Corporation

By: _____
Jennifer Cotner
Attorneys for Defendant
UNITED AIRLINES, INC.
(f/k/a United Air Lines, Inc.)

*MILLER LAW GROUP*
*A PROFESSIONAL CORPORATION*
*CALIFORNIA*

**VERIFICATION**

I, Sinasi Stewart, declare:

I am an Operating Manager Airframe Overhaul & Repair - Technical Operations, for Defendant UNITED AIRLINES, INC., in the above-entitled action, and I have been authorized to make this verification on its behalf in that capacity.

I have read the foregoing DEFENDANT UNITED AIRLINES, INC.'S AMENDED RESPONSES TO PLAINTIFF RAUL BONILLAS' INTERROGATORIES, SET ONE, and know the contents thereof.  The information set forth in these Responses is not within the personal knowledge of any single employee of Defendant UNITED AIRLINES, INC., including myself.  I understand and believe that the information set forth in these Responses has been gathered from a number of individuals in order to provide the most complete responses possible.  I believe the information set forth in these Responses is accurate and correct, and I believe them to be true.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed at Houston, Texas, on October 28, 2013.

Sinasi Stewart

4823-9529-6022, v. 2

1

**CERTIFICATE OF SERVICE**

2
3
4

I, Frances L. Skaggs, declare that I am employed at Miller Law Group, A Professional Corporation, whose address is 111 Sutter Street, Suite 700, San Francisco, CA 94104; I am over the age of eighteen (18) years and am not a party to this action.  On the below date, by the method noted below, I served the following document(s):

5

**DEFENDANT UNITED AIRLINES, INC.'S AMENDED RESPONSES TO PLAINTIFF RAUL BONILLAS' INTERROGATORIES, SET ONE**

6
7

on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope addressed as follows:

8
9
10
11
12

Spencer F. Smith
Dow W. Patten
Smith Patten
353 Sacramento Street, Ste. 1120
San Francisco, CA 94111
Tel:   (415) 402-0084
Fax:   (415) 520-0104
spencer@smithpatten.com
dow.patten@gmail.com

Attorney for Plaintiff:  *RAUL BONILLAS*

13

14
15
16
17

☒   **BY MAIL:**  By placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the ordinary course of business for collection and mailing on this date at Miller Law Group, 111 Sutter Street, San Francisco, California. I declare that I am readily familiar with the business practice of Miller Law Group for collection and processing of correspondence for mailing with the United States Postal Service and that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business.

18
19

☒   [Federal]  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

20

Executed on October 29, 2013 at San Francisco, California.

21
22
23

_____
Frances L. Skaggs

24
25
26
27
28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
CALIFORNIA

**EXHIBIT 3**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - -x

RAUL BONILLAS, an individual,     :

    Plaintiff,                    :

    v.                         : Case No.:

UNITED AIR LINES, INC., and    : 4:12-CV-06574-SBA

DOES 1 through 10, inclusive,   :

    Defendants.                   :

- - - - - - - - - - - - - - -x

                Wednesday, January 29, 2014

                    Reston, Virginia

VIDEO CONFERENCE DEPOSITION OF

             KENNETH HOLDER

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at 2:31 p.m. at the office of

Reston Court Reporting, 11710 Plaza America Drive,

Suite 2000, Reston, Virginia, before Denise D.

Vickery, notary public in and for the Commonwealth

of Virginia, when were present on behalf of the

respective parties:

1     A      Washington, DC.  Manager of aircraft

2 maintenance.

3     Q      And how long have you held this position?

4     A      My current position, approximately two and

5 a half years.

6     Q      And prior to being manager of aircraft

7 maintenance in Washington, DC, have you held any

8 other positions at United?

9     A      Several dozen.

10     Q      What was the position immediately previous

11 to this current position?

12     A      Manager of components, San Francisco.

13     Q      And how long did you hold that position?

14     A      Approximately four and a half months.

15     Q      Do you recall when you began working at

16 San Francisco as the manager of components?

17     A      Sometime in early November of 2010.

18     Q      Okay.  So from November 2010 and when

19 approximately was your end date --

20     A      Late --

21     Q      -- at San Francisco?

22     A      I believe it was late or early March of --

1   late March or early April of 2011.

2        Q    And what was the reason for you leaving

3   San Francisco and transferring to Washington?

4        A    I was required to re-interview for my job,

5   and I was not successful.

6        Q    Was this part of the talent selection

7   process?

8        A    Yes, it was.

9        Q    And who did you interview with in San

10  Francisco?

11       A    Shannon Wagner and a gentleman from

12  Continental Airlines, who I do not recollect his

13  name.

14       Q    Okay.  And prior to being manager of

15  components in San Francisco, what position did you

16  hold previous to that San Francisco position?

17       A    Manager of -- I'm sorry.  Vendor manager

18  of components.

19       Q    And where were you located?

20       A    San Francisco.

21       Q    And approximately how long were you the

22  vendor manager of components in San Francisco?

1          MS. THOMPSON:  Objection.  Misstates the

2    testimony.

3          You can answer.

4          THE WITNESS:  I don't recall them by name,

5    but it was a series of videos that takes you -- it

6    assumes I know nothing.  So it takes me from what

7    EEO is, describes harassment and discrimination,

8    gives examples, teaches you how to manage those

9    situations and who to direct those concerns to.

10         BY MS. ROSIEN:

11    Q    Okay.  And you testified previously that

12    when you were the manager of components in San

13    Francisco for approximately four to five months, you

14    supervised anywhere from six to nine supervisors.

15    A    My apologies.  I now recollect I had more

16    staff than supervisors.  My total administrative

17    staff, which included analysts, secretaries,

18    supervisors, clerks, was approximately 18 people.

19    Q    And were these 18 people -- did they

20    directly report to you?

21    A    Yes, they did.

22    Q    And if we can start with the supervisors

1   that directly reported to you, do you recall the

2   names of the supervisors who directly reported to

3   you in your position of manager of components in San

4   Francisco?

5          A    Yes, I do.

6          Q    Can you please state those names for us?

7          A    David Ferreira.  And I'm not sure if I'm

8   100% on the spelling.  F-e-r-r-i-e-r-a.  Second name

9   female.  Yvonne, Y-v-o-n-n-e, Pierce, P-i-e-r-c-e.

10  Third name Felipe Mendoza.  F-e-l-i-p-e

11  M-e-n-d-o-z-a.  Anthony or Tony Shevchenko.

12  A-n-t-h-o-n-y.  I'm not positive about the spelling

13  anymore.  S-c-h-e-as-in-Edward-Victor-e-n-k-o.

14          Next name George Constantineau.

15  G-e-o-r-g-e.  Constantineau.

16  C-o-n-s-t-a-n-t-i-n-e-a-u.  James Bakke.  James,

17  J-a-m-e-s.  Bakke, B-a-k-k-e.  Dan or Raul Bonillas.

18  R-a-u-l B-o-n-i-l-l-a-s.  James Varghese.

19  J-a-m-e-s.  V-as-in-Victor-a-r-g-h-e-s-e.

20          Can you read the names back to me to make

21  sure I didn't miss someone?

22          Q    Sure.  We have David Ferreira, Yvonne

1    Pierce, Felipe Mendoza, Anthony or Tony Shevchenko,

2    George Constantineau -- Constantineau, James Bakke,

3    Dan or Raul Bonillas -- Bonillas and James Varghese.

4         A    One moment, please.   I just want to make

5    sure I'm correct.

6              That is correct.

7         Q    So these were all the supervisors who

8    directly reported to you during your

9    four-and-a-half-month period in San Francisco as

10   manager of components; is that correct?

11             MS. THOMPSON:   Objection.   Misstates the

12   testimony.

13             You can answer.

14             BY MS. ROSIEN:

15        Q    If you understand the question, you can

16   answer, Mr. Holder.

17        A    I do not understand the question.

18        Q    Did all -- did the eight individuals that

19   you just listed off -- were these all supervisors

20   that reported to you while you were the manager of

21   components in San Francisco?

22        A    Yes, they were.

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )

COMMONWEALTH OF VIRGINIA )

I, DENISE D. VICKERY, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.



Notary Public in and for the

Commonwealth of Virginia

My Commission expires March 31, 2014 ID - 126014

Denise D. Vickery
Notary Public
State of Virginia at Large

**EXHIBIT 4**

# SMITH
## PATTEN

353 Sacramento St., Suite 1120
San Francisco, CA 94111
v 415-402-0084
f 415-520-6950
www.smithpatten.com

*VIA FACSIMILE (415) 464-4336*

July 28, 2014

Tracy Thompson
Janine Simmerly
Jennifer Cotner
MILLER LAW GROUP
A Professional Corporation
111 Sutter Street, Suite 700
San Francisco, CA 94104

  *Re:* *Bonillas v. United Air Lines, Inc.* , U. S. D. C. Case No. 4:12-cv-06574-SBA

Dear Ms. Thompson, Ms. Simmerly, and Ms. Cotner:

  As part of the pretrial planning process in this matter, and in order to narrow the issues for trial, the parties agreed at our meeting last week to review the claims and defenses to determine whether any could be dismissed prior to trial.

  After review, Plaintiff is willing to dismiss the 4th and 5th claims for disability discrimination under 42 U.S.C. §1201 and Cal. Gov. Code §12900, respectively on condition that Defendant agree not to seek either fees or costs on such claims. Please let us know if you agree to that proposal as part of the pretrial planning process.

Very truly yours,

Dow W. Patten

1