# EXHIBIT "A"

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAUL BONILLAS, an individual,

           Plaintiff,        CASE NO.
    vs.                      C 12 6574

UNITED AIR LINES, INC. AND
DOES 1 through 10, inclusive,

           Defendants.

_____/

DEPOSITION OF RAUL D. BONILLAS

VOLUME I

January 15, 2014

Reported by:
WENDY C. BROWN, CSR
LICENSE NO. 5697

PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
3533 Castro Valley Boulevard, Suite G
Castro Valley, California 94546
(510) 885-2371    Fax: (510) 247-9775

1          Go ahead.

2          MS. THOMPSON:  Q.  Do you know whether other

3     people had injuries similar to yours that were in your

4     supervisory ranks besides you, or were you the only one?

5     A.     I'm the only one that I know of.

6     Q.     So you don't know whether or not other people

7     have injuries or not?

8     A.     Like that, no.

9     Q.     Now, with regard to the PTSD, are you claiming

10    that the PTSD had something to do with your not getting

11    the supervisory position in October 2011?

12          MR. PATTEN:  The claims are set forth in the

13    complaint.

14          Testify as to your understanding.

15          THE WITNESS:  Yes.

16          MS. THOMPSON:  Q.  Okay.  Who were the people at

17    United Airlines that you have spoken to about your

18    diagnosis of PTSD --

19          MR. PATTEN:  Vague as to time.

20          MS. THOMPSON:  If you let me finish.

21          MR. PATTEN:  I'm sorry.

22          MS. THOMPSON:  Q.  We'll say from 2008 through

23    the present.  And I'm not -- and I want to further limit

24    it to people who are managers or supervisors, not the

25    medical department or anything else, okay?  So which

1　managers or supervisors have you had any discussions

2　with about PTSD from 2008 to the present?

3　A.　　Well, I remember that when the mechanic,

4　Karl Scheele, was being threatening to me, he was

5　threatening to me and I was pretty rattled by it, um,

6　'cause he supposedly said I was out to get him.　And

7　then I reported this to Kevin, and I told -- and then

8　he -- I remember he told Bonnie about it.

9　Q.　　I need you to tell me what you said,

10　specifically.

11　A.　　I told him that I was -- maybe I'm getting

12　rattled because I was threatened in the past by an

13　employee, and -- and -- and I was threatened in the past

14　by -- I'm trying to -- I said I was threatened before by

15　an employee at work, and I don't know if that's why I'm

16　getting so rattled over this, the threat.

17　Q.　　Let me make sure we're clear here.　So you're

18　saying you had a conversation with Kevin Sklanka.　Did

19　you also have a conversation with Bonnie Turner?

20　A.　　No.

21　Q.　　So let's focus on the conversation with Kevin

22　Sklanka about this subject.

23　A.　　I think just that conversation, and then, like,

24　follow up on how I was doing -- how I was doing later

25　when I -- how I felt after.

1  Q.    Okay.  Two conversations with Kevin Sklanka?

2  A.    That's what I recall.

3  Q.    So tell me everything you remember about the

4  very first conversation with Kevin Sklanka?

5  A.    Just that -- I was, like -- I was thinking that

6  I was, like, rattled because I had been threatened at

7  work in the past --

8  Q.    Is that --

9  A.    -- by an employee.

10 Q.    Is that everything you can recall that you said

11 to Mr. Sklanka?

12 A.    That's what I -- yeah, that's what I remember.

13 Q.    Okay.  And did you say -- what else did you say

14 in the second conversation, if anything?

15 A.    I mean, I'm just thinking he was following up to

16 see how I was doing, that's all I remember, how I was

17 doing after that.

18 Q.    So Kevin came back to you and said, "How are you

19 doing," and you basically said what in response?

20 A.    I mean, later on, I was -- you know, I went

21 back -- I was at work and everything, and I continued to

22 do my job.

23 Q.    Okay.  So did you tell him you were basically

24 okay?

25 A.    At that time, yes.

1    Q.      Okay.  Have you now exhausted your recollection

2    of everything you said to Kevin Sklanka and that he said

3    to you about having to do with post-traumatic stress

4    disorder?

5    A.      Yes, that I can recall, yes.

6    Q.      Okay.  Who else besides Mr. Sklanka have you had

7    any discussions with about the subject of PTSD?

8    A.      Well, what I remember is that I was -- I

9    remember that Ken Holder was asking me why -- like, he

10   was wondering why I was doing things the way I was

11   doing, and, like, he didn't understand why I was -- he

12   didn't understand why -- it seemed like I was taking

13   longer to do things, and I was.  And he couldn't

14   understand why I wasn't remembering everything, so --

15   you know, so fast, and I remember he told me that he

16   looked at my whole file, and he says, you know, "I

17   looked at your whole file, and I already looked

18   everything over.  Is there anything you need to tell

19   me?"  And I said, "I have PTSD."

20   Q.      Okay.

21   A.      Because that's what I thought -- that's what I

22   remember saying, "I have PTSD."

23   Q.      Okay.  And what else did you and Mr. Holder say

24   to one another in this conversation, other than what

25   you've already testified to?

1   A.    Um, I think that was -- because he was wondering

2   why I was getting -- why I would mix things up, get --

3   make some mistakes, mixing stuff up -- I am not

4   remembering certain things.

5   Q.    I understand that. I'm trying to have you tell

6   me everything you said to Mr. Holder and he said to you

7   in this conversation, where you talked about your PTSD.

8   I want you to exhaust your memory.

9   A.    Um-hum. I mean, that's all I can remember

10   about, is what we talked about.

11   Q.    So have you now told me absolutely everything

12   you can recall in terms of what Mr. Sklanka -- I'm

13   sorry -- what you said to Mr. Holder and what Mr. Holder

14   said to you in this conversation in which the subject of

15   your PTSD came up?

16   A.    Yes.

17   Q.    Okay. Thank you.

18        Okay. Any other conversations with anyone at

19   United, management, that had anything to do with your

20   PTSD, other than what you've already told me?

21   A.    In 2008, you mean?

22   Q.    2008 through the present.

23   A.    No.

24   Q.    Now, when you spoke with Mr. Holder, did you

25   tell him that you wanted any kind of accommodation,

1    Q.      And what facts do you have that lead you to that

2    belief, that that 1992 injury had something to do with

3    the decision not to give you your supervisor job in

4    2011?

5            MR. PATTEN:  Misstates testimony.

6            THE WITNESS:  Well, I'm not really the way I was

7    before I got injured, so I just think that's why -- you

8    know, when I do my job, it takes me a little longer to

9    do my job.  And sometimes when I have to do certain

10   things, I do it, and I think it impacts that.  And I

11   think that that was a factor in me not getting my job.

12           MS. THOMPSON:  Q.  All right.  I know that's the

13   opinion or belief you have, but is there anything you

14   can point to which supports that opinion or belief that

15   that somehow factored into the decision not to make you

16   a supervisor in 2011?

17           MR. PATTEN:  Calls for speculation.

18           Go ahead.

19           THE WITNESS:  I mean, I didn't see -- I don't

20   see anybody else that had -- I don't see anybody else

21   that -- I was the only person in my whole department

22   that didn't get the job back again, and I'm sure other

23   people have things that are wrong with -- you know, not

24   everybody's perfect, but I was the only one that was --

25   didn't get their job.

1          MS. THOMPSON:  Q.  Okay.  I definitely

2   understand that, but all I'm trying to figure out is why

3   you think the fact that you did not get the job had any

4   connection at all to the 1992 back injury, neck injury

5   or right ankle injury?  I understand that you didn't get

6   the job, but what makes you think there's some

7   connection between the two?

8          MR. PATTEN:  Misstates the testimony.

9          Go ahead.

10         THE WITNESS:  I don't have anything else -- any

11  documents or anything, I mean ....

12         MS. THOMPSON:  Q.  I'm not asking for documents.

13  I'm asking for any evidence -- for anything you can

14  point to that leads you to your belief that the decision

15  not to give you your supervisory position in 2011 had

16  something to do with your 1992 injury.

17         MR. PATTEN:  Misstates testimony.  Harassing,

18  argumentative.

19         THE WITNESS:  I don't -- I don't have anything

20  that I could think of right now.

21         MS. THOMPSON:  Q.  Okay.  And I take it you

22  don't know one way or the other what disability people

23  might have that did, in fact, get their jobs, do you?

24         MR. PATTEN:  Objection; lacks foundation, calls

25  for speculation, incomplete hypothetical.

1        Go ahead.

2        MS. THOMPSON:  Q.  Do you know whether other

3   people had injuries similar to yours that were in your

4   supervisory ranks besides you, or were you the only one?

5   A.      I'm the only one that I know of.

6   Q.      So you don't know whether or not other people

7   have injuries or not?

8   A.      Like that, no.

9   Q.      Now, with regard to the PTSD, are you claiming

10  that the PTSD had something to do with your not getting

11  the supervisory position in October 2011?

12        MR. PATTEN:  The claims are set forth in the

13  complaint.

14        Testify as to your understanding.

15        THE WITNESS:  Yes.

16        MS. THOMPSON:  Q.  Okay.  Who were the people at

17  United Airlines that you have spoken to about your

18  diagnosis of PTSD --

19        MR. PATTEN:  Vague as to time.

20        MS. THOMPSON:  If you let me finish.

21        MR. PATTEN:  I'm sorry.

22        MS. THOMPSON:  Q.  We'll say from 2008 through

23  the present.  And I'm not -- and I want to further limit

24  it to people who are managers or supervisors, not the

25  medical department or anything else, okay?  So which

1    managers or supervisors have you had any discussions

2    with about PTSD from 2008 to the present?

3    A.      Well, I remember that when the mechanic,

4    Karl Scheele, was being threatening to me, he was

5    threatening to me and I was pretty rattled by it, um,

6    'cause he supposedly said I was out to get him.  And

7    then I reported this to Kevin, and I told -- and then

8    he -- I remember he told Bonnie about it.

9    Q.      I need you to tell me what you said,

10   specifically.

11   A.      I told him that I was -- maybe I'm getting

12   rattled because I was threatened in the past by an

13   employee, and -- and -- and I was threatened in the past

14   by -- I'm trying to -- I said I was threatened before by

15   an employee at work, and I don't know if that's why I'm

16   getting so rattled over this, the threat.

17   Q.      Let me make sure we're clear here.  So you're

18   saying you had a conversation with Kevin Sklanka.  Did

19   you also have a conversation with Bonnie Turner?

20   A.      No.

21   Q.      So let's focus on the conversation with Kevin

22   Sklanka about this subject.

23   A.      I think just that conversation, and then, like,

24   follow up on how I was doing -- how I was doing later

25   when I -- how I felt after.

1   Q.      Okay.  Two conversations with Kevin Sklanka?

2   A.      That's what I recall.

3   Q.      So tell me everything you remember about the

4   very first conversation with Kevin Sklanka?

5   A.      Just that -- I was, like -- I was thinking that

6   I was, like, rattled because I had been threatened at

7   work in the past --

8   Q.      Is that --

9   A.      -- by an employee.

10  Q.      Is that everything you can recall that you said

11  to Mr. Sklanka?

12  A.      That's what I -- yeah, that's what I remember.

13  Q.      Okay.  And did you say -- what else did you say

14  in the second conversation, if anything?

15  A.      I mean, I'm just thinking he was following up to

16  see how I was doing, that's all I remember, how I was

17  doing after that.

18  Q.      So Kevin came back to you and said, "How are you

19  doing," and you basically said what in response?

20  A.      I mean, later on, I was -- you know, I went

21  back -- I was at work and everything, and I continued to

22  do my job.

23  Q.      Okay.  So did you tell him you were basically

24  okay?

25  A.      At that time, yes.

1    Q.      Okay.  Have you now exhausted your recollection

2    of everything you said to Kevin Sklanka and that he said

3    to you about having to do with post-traumatic stress

4    disorder?

5    A.      Yes, that I can recall, yes.

6    Q.      Okay.  Who else besides Mr. Sklanka have you had

7    any discussions with about the subject of PTSD?

8    A.      Well, what I remember is that I was -- I

9    remember that Ken Holder was asking me why -- like, he

10    was wondering why I was doing things the way I was

11    doing, and, like, he didn't understand why I was -- he

12    didn't understand why -- it seemed like I was taking

13    longer to do things, and I was.  And he couldn't

14    understand why I wasn't remembering everything, so --

15    you know, so fast, and I remember he told me that he

16    looked at my whole file, and he says, you know, "I

17    looked at your whole file, and I already looked

18    everything over.  Is there anything you need to tell

19    me?"  And I said, "I have PTSD."

20    Q.      Okay.

21    A.      Because that's what I thought -- that's what I

22    remember saying, "I have PTSD."

23    Q.      Okay.  And what else did you and Mr. Holder say

24    to one another in this conversation, other than what

25    you've already testified to?

1    A.      Um, I think that was -- because he was wondering

2    why I was getting -- why I would mix things up, get --

3    make some mistakes, mixing stuff up -- I am not

4    remembering certain things.

5    Q.      I understand that.  I'm trying to have you tell

6    me everything you said to Mr. Holder and he said to you

7    in this conversation, where you talked about your PTSD.

8    I want you to exhaust your memory.

9    A.      Um-hum.  I mean, that's all I can remember

10   about, is what we talked about.

11   Q.      So have you now told me absolutely everything

12   you can recall in terms of what Mr. Sklanka -- I'm

13   sorry -- what you said to Mr. Holder and what Mr. Holder

14   said to you in this conversation in which the subject of

15   your PTSD came up?

16   A.      Yes.

17   Q.      Okay.  Thank you.

18           Okay.  Any other conversations with anyone at

19   United, management, that had anything to do with your

20   PTSD, other than what you've already told me?

21   A.      In 2008, you mean?

22   Q.      2008 through the present.

23   A.      No.

24   Q.      Now, when you spoke with Mr. Holder, did you

25   tell him that you wanted any kind of accommodation,

```
 1   workplace accommodation, for your PTSD?

 2   A.      I don't remember asking him for that.

 3   Q.      Okay.  Now, in the past, though, you had asked

 4   for accommodations to various issues, medical issues

 5   during your employment, correct?

 6   A.      Um, if I had a hard time doing something, like I

 7   needed help, I'd go ask for assistance, yes.

 8   Q.      But you'd also ask for specific accommodation

 9   for your disabilities at United Airlines, right?

10           MR. PATTEN:  Calls for a legal conclusion.

11           Testify as to your understanding.

12           THE WITNESS:  What I remember pretty much is

13   that when you go to work, they release you to your duty,

14   and then they already kind of know what you had.

15           MS. THOMPSON:  Q.  You asked for an

16   accommodation at United Airlines for your PTSD when it

17   happened, right, in 2001?

18           MR. PATTEN:  Same objection; go ahead.

19           THE WITNESS:  I just remember that I went

20   through workers' comp.  I don't remember if I asked for

21   accommodation.  I just remember they cleared me and I

22   went back to work.

23           MS. THOMPSON:  Q.  Right.  You were given time

24   off?

25   A.      With workers' comp, I was given time off, yes.
```

1   Q.     Okay.  And United gave you that time off, right?

2   A.     Yes.

3   Q.     Okay.  And when you got injured in 1992, you

4   also were given time off from work, right?

5   A.     Yes.

6   Q.     Okay.

7   A.     Yeah, 'cause I was off for five months for that.

8   Q.     Right.  Okay.

9         Did you ask Mr. Holder at any time to do

10  anything for you to help you deal with your PTSD?

11  A.     Well, he -- I remember towards the end of --

12  before he left, he -- he said he was -- he told me he

13  was going to -- he was going to work with me and try to

14  give me some hints about, like, using calendars and

15  trying to give me some suggestions for, like, like -- to

16  remember, and stuff like that.  So he was kind of -- he

17  was kind of doing that, but he also said he was going to

18  recommend that I get, like -- what I remember he said is

19  I was going to get, like, a performance improvement

20  plan.  And then he was transferred out.

21  Q.     Okay.  My question again was, did you ever ask

22  Mr. Holder to take any action with regard to your PTSD?

23         MR. PATTEN:  Asked and answered.

24         Answer it again.

25         MS. THOMPSON:  Q.  That's a "yes" or "no."

1   exactly that you objected to about this meeting?

2   A.      That I was told in front of the union people

3   there and Karl that if I didn't stop getting the

4   complaints against -- if I didn't stop the complaints

5   against him, then I would be fired.

6   Q.      So let's -- I want you to tell me everything

7   that was said by Mr. Wagner during this meeting, to the

8   best of your ability.

9   A.      Okay.  Um, what I remember was that, um,

10  there -- they were talking about that there was

11  supposedly some act -- there was some kind of an

12  actuator that was supposedly -- some kind of actuator

13  that was supposedly pulled from an accident, a reverser,

14  and it was -- and that was a false allegation that was

15  made.

16  Q.      What did Mr. Wagner say?

17  A.      Okay, Mr. -- okay.  What Mr. Wagner said was --

18  like, what I remember him saying is that, "You need to

19  stop these complaints from coming in.  You need to put a

20  stop to these complaints coming in from Karl Scheele."

21  Q.      Wait a second.  Did Mr. Wagner lead the meeting?

22  A.      Yes.

23  Q.      Okay.  And this meeting happened in about May of

24  2011?

25  A.      Yes.  I'm not sure of the date, though.  I'm

```
 1   Q.      Okay.   So other than talking about the actuator
 2   complaint that Karl Scheele was making against you, what
 3   other complaints were discussed in the union meeting
 4   that took place around May of 2011?
 5            MR. PATTEN:  Asked and answered.
 6            Answer it again.
 7            THE WITNESS:  Uh, nothing else.
 8            MS. THOMPSON:  Q.  All right.  Now, you were
 9   referring to complaints of workplace violence?  What
10   complaints of workplace violence were you referring to?
11   A.      Well, one of the incidents of workplace violence
12   that I brought up -- that I was involved in taking
13   action was an inspector, Martin Memeduce,
14   M-e-m-e-d-u-c-e.  He -- he called the police on Karl
15   because he felt he was making threats to him.
16   Q.      When did this take place?
17            MR. PATTEN:  Vague as to "this."  Vague as to
18   time.
19            MS. THOMPSON:  Q.  This incident that you're
20   referring to involving Martin Memeduce.
21   A.      That was shortly after Ken got there, I remember
22   that.
23   Q.      So that was in 2010, right?
24   A.      Yes.
25   Q.      Okay.  All right.  So that's a complaint of
```

1    workplace violence?

2    A.      Yes.

3    Q.      What other complaints of workplace violence were

4    you referring to?

5    A.      Karl threatened to -- Karl Scheele threatened

6    to -- to take a lead mechanic, Ivan McDowell -- he

7    threatened -- he wanted him to go outside, made a threat

8    to him, "Let's go outside," something like that.  That's

9    a workplace violence issue.

10   Q.      When did that situation happen?

11   A.      That happened around -- I think that's just

12   before the police were called.  Oh, wait a second.

13   Somewhere in that time frame.

14   Q.      The same time frame?

15   A.      Yes.

16   Q.      2010?

17   A.      Yes.

18   Q.      What other incidents of workplace violence were

19   you referring to?

20   A.      I believe that incident with Maria Figueroa,

21   backing her against the sink, I believe -- to me, that's

22   workplace violence.

23   Q.      Any other instance of workplace violation that

24   you were concerned about?

25   A.      The incident when Karl went upstairs and the two

1  supervisors in payroll felt they were threatened, that

2  Kevin was kind of -- said he was taking over the

3  investigation of -- or he interfered with that.  I

4  considered that to be workplace violence, because the

5  two supervisors emailed me and said they felt

6  threatened.

7  Q.     That incident with payroll happened before mid

8  2010, is that correct, when Kevin was still there?

9  A.     When Kevin was still there.

10  Q.     And you said he left around mid 2010, right?

11  A.     Yes.

12  Q.     When did the Maria Figueroa happen; what year

13  was that?

14  A.     I believe that was early 2010.

15  Q.     Early 2010; is that right?

16  A.     Oh, wait.  No, couldn't be, because Ken was

17  there when it happened.  So it had to have -- towards

18  the end -- after Kevin left, 'cause Ken was there.

19  Q.     So sometime in 2010 or 2011?

20  A.     Yes.

21  Q.     Okay.  Any other complaints of workplace

22  violence that you were referring to, other than what

23  you've already told me?

24  A.     I consider when I reported that I felt kind of

25  threatened with Karl, when I was rattled by that, I

1    consider that's kind of workplace violence, too.

2    Q.    So you had your own complaint, right, against

3    Mr. Scheele?

4    A.    I don't remember if I made a written complaint

5    on that, but I remember -- I considered that to be a

6    workplace violence incident.

7    Q.    Did you make a complaint to human resources

8    about that?

9    A.    I remember that -- I think Bonnie notified

10   Sandra Singer, I think.

11   Q.    That wasn't my question, though.  My question --

12   A.    I did not notify, but --

13   Q.    We need to have a clear record here.  So the

14   question is, did you notify anyone in human resources

15   about your concerns of workplace violence involving

16   Mr. Scheele?

17         MR. PATTEN:  Objection; vague and ambiguous as

18   to "human resources," vague as to time.

19         THE WITNESS:  I believe I notified the security

20   department, but not HR.

21         MS. THOMPSON:  Q.  Thank you.  Is there some

22   reason why you didn't notify human resources?

23         MR. PATTEN:  Vague as to "human resources."

24         MS. THOMPSON:  Q.  I'm sorry?

25   A.    When the complaint -- when Ivan notified me, I

1                          CERTIFICATE

2

3          I, the undersigned, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was first duly sworn to testify to

6   the truth, the whole truth, and nothing but the truth in

7   the within-entitled cause; that said deposition was

8   taken at the time and place therein stated; that the

9   testimony of said witness was reported by me, a

10  disinterested person, and was thereafter transcribed

11  under my direction into typewriting; that the foregoing

12  is a full, complete and true record of said testimony;

13  and that the witness was given an opportunity to read

14  and, if necessary, correct said deposition and to

15  subscribe to the same.

16          I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.   Executed this 20th day of January, 2014.

21

22                          _Wendy C G_

23                          _____

                            CERTIFIED SHORTHAND REPORTER
24                          NO. 5697

25

# EXHIBIT "B"

| | |
|---|---|
| **From:** | Prpich, Mark [SFOLR] [Mark.Prpich@united.com] |
| **Sent:** | Tuesday, May 31, 2011 2:14 PM |
| **To:** | Kathleen Tetrev; Paul Darrow |
| **Subject:** | Fwd: Request to return to mechanic status effective May 31, 2011 |

FYI

Sent from my iPhone

Begin forwarded message:

**From:** "Prpich, Mark [SFOLR]" <Mark.Prpich@united.com>
**Date:** May 31, 2011 4:03:25 PM CDT
**To:** "Singer, Sandee [SFOHR]" <Sandee.Singer@united.com>
**Cc:** "Stewart, Sinasi" <sinasi.stewart@coair.com>
**Subject: Re: Request to return to mechanic status effective May 31, 2011**

I just spoke with the Clearance Team. There appears to be an issue with his Medical clearance. The Clearance Team is evaluating and will update us ASAP.
Thanks
Mark

Sent from my iPhone

On May 31, 2011, at 3:53 PM, "Singer, Sandee [SFOHR]" <Sandee.Singer@united.com> wrote:

> Sinasi- This is being handled by Mark Prpich.
>
> Mark- can you advise the status?
>
> Sandee
>
> **Sandee Singer, PHR-CA**
> HR Associate, Employee Relations
>
> United | 800 South Airport Blvd | United Maintenance Center | SFOHR | San Francisco, CA 94128
> Tel 650 634 5133 | Fax 650 634 7442 | sandee.singer@united.com
>
> ***************************************************************
> For policy & procedure questions
> please contact:
> Employee Service Center (ESC)
> (877) 825-3729 or (877) UAL-ESC9
> ESC@united.com
> 
> **From:** Stewart, Sinasi [mailto:Sinasi.Stewart@coair.com]
> **Sent:** Tuesday, May 31, 2011 11:35 AM
> **To:** Singer, Sandee [SFOHR]
> **Subject:** RE: Request to return to mechanic status effective May 31, 2011
>
> Sandee any update on Raul? Is he cleared to go back?

United/Bonillas-002631